[L.A. No. 30058. In Bank. Oct. 25, 1973.]

LELAND W. GEILER, a Judge of the Municipal Court, Petitioner, v. COMMISSION ON JUDICIAL QUALIFICATIONS, Respondent.

## COUNSEL

Hutchinson & Irwin, Paul R. Hutchinson and James A. Irwin for Petitioner.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, James H. Kline and Douglas B. Noble, Deputy Attorneys General, for Respondent.

## OPINION

**THE COURT.**—Petitioner was appointed a judge of the Municipal Court for the Los Angeles Judicial District of Los Angeles County on December 30, 1966. On March 26, 1971, the Commission on Judicial Qualifications[1] (hereafter the Commission) resolved on its own motion pursuant to rule 904 of the California Rules of Court[2] to conduct a preliminary in-

---

[1]The California Constitution, article VI, section 8, provides in pertinent part: "The Commission on Judicial Qualifications consists of 2 judges of courts of appeal, 2 judges of superior courts, and one judge of a municipal court, each appointed by the Supreme Court; 2 members of the State Bar who have practiced law in the State for 10 years, appointed by its governing body; and 2 citizens who are not judges, retired judges, or members of the State Bar, appointed by the Governor and approved by the Senate, a majority of the membership concurring. All terms are 4 years."

Article VI, section 18, subdivision (c), of the California Constitution provides: "On recommendation of the Commission on Judicial Qualifications the Supreme Court may (1) retire a judge for disability that seriously interferes with the performance of his duties and is or is likely to become permanent, and (2) censure or remove a judge for action occurring not more than 6 years prior to the commencement of his current term that constitutes wilful misconduct in office, wilful and persistent failure to perform his duties, habitual intemperance, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute."

Subdivision (e) of the same section provides: "The Judicial Council [see Cal. Const., art. VI, § 6] shall make rules implementing this section and providing for confidentiality of proceedings." These are rules 901-921 of the California Rules of Court.

[2]All references herein to specific rules are to the California Rules of Court.

"Rule 904. Preliminary Investigation.

"(a) The Commission, upon receiving a verified statement, not obviously unfounded or frivolous, alleging facts indicating that a judge is guilty of wilful misconduct in office, wilful and persistent failure to perform his duties, habitual intemperance, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute, or that he has a disability that seriously interferes with the performance of his duties and is or is likely to become permanent, shall make a preliminary

vestigation of the judicial conduct of petitioner. Pursuant to rule 905 the Commission filed a notice of formal proceedings herein on January 21, 1972. The Commission requested this court by resolution of February 11, 1972, to appoint three special masters for the taking of evidence, as authorized by rule 907. By order filed March 7, 1972, this court appointed three special masters to hear and take evidence in this matter and to report thereon to the Commission.[3]

After a hearing which consumed 21 court days the masters rendered their report on July 5, 1972. The Commission had set forth in the six counts of its notice of formal proceedings 23 specifications of wilful misconduct in office and conduct prejudicial to the administration of justice. The masters found that petitioner had, as charged in five of these specifications, been guilty of conduct prejudicial to the administration of justice which brought the judicial office into disrepute. As to the remaining specifications the masters concluded that petitioner was not guilty of wilful misconduct in office or conduct prejudicial to the administration of justice. The masters unanimously recommended that petitioner "be censured for the following reasons: [¶] 1. Indiscreet use of vulgar, unjudicial and inappropriate language directed toward court attaches and lawyers. [¶] 2. His crude and offensive conduct in public places."

Both petitioner and the examiners filed objections to the report of the masters pursuant to rule 913.[4] After the Commission had itself heard oral argument in accordance with rule 914, and following each member's consideration of the evidence adduced before the masters and the objections filed to the masters' findings thereon, the Commission issued its own unanimous findings of fact and conclusions of law. In addition to the five specifications upon which the masters had found petitioner guilty of misconduct, the Commission also found petitioner guilty of conduct prejudicial to the administration of justice as charged in four other specifications. In relation to the remaining 14 specifications the Commission concluded

---

investigation to determine whether formal proceedings should be instituted and a hearing held. The Commission without receiving a verified statement may make such a preliminary investigation on its own motion."

[3]We appointed Arthur L. Alarcon, judge of the Superior Court of the County of Los Angeles (presiding master); D. Sterry Fagan, judge of the Superior Court of the County of Los Angeles; and Peter S. Smith, judge of the Municipal Court for the Alhambra Judicial District of Los Angeles County who, before hearings began, was elevated to the Superior Court of the County of Los Angeles.

[4]The Commission designated two deputy attorneys general as examiners "to gather and present evidence before the masters or Commission with respect to the charges against a judge." (Rule 921 (f).) The same deputy attorneys general argued the cause for the Commission before this court.

that the charges were either unproved or did not warrant discipline. The Commission thereupon recommended to this court, pursuant to rule 917 and article VI, section 18 of the California Constitution (see fn. 1, *supra*), that petitioner be removed from office. The recommendation of removal was approved by seven members of the Commission. The two remaining members of the Commission voted to recommend censure rather than removal of petitioner.

■■■■ We granted a writ of review to examine the Commission's findings of fact, conclusions of law, and recommendation of removal.[5] (See rule 920.) After reviewing the entire record, we adopt the recommendation of the Commission.

■ In reviewing the Commission's recommendation, we must address ourselves to the issue of the quantum of proof applicable to an inquiry concerning a judge. We believe the burden of proof imposed upon the examiners in such an inquiry should be analogous to that employed in State Bar disciplinary proceedings, wherein we require that charges of misconduct "be sustained by convincing proof and to a reasonable certainty and any reasonable doubts should be resolved in favor of the accused." (*Moore* v. *State Bar* (1964) 62 Cal.2d 74, 79 [41 Cal.Rptr. 161, 396 P.2d 577].) ■ We accordingly declare the standard of proof in such an inquiry before the Commission to be proof by clear and convincing evidence sufficient to sustain a charge to a reasonable certainty. (Cf. *Medoff* v. *State Bar* (1969) 71 Cal.2d 535, 550 [78 Cal.Rptr. 696, 455 P.2d 800].)

■ The Commission, not the masters, is vested by the Constitution with the ultimate power to recommend to this court the censure, removal or retirement of a judge. Thus the Commission is free to disregard the report of the masters and may prepare its own findings of fact and consequent conclusions of law. The Commission must, however, apply the "clear and convincing evidence" standard of proof in its independent evaluation of the evidence adduced before the masters. Moreover, "[s]ince it is difficult to pass upon the weight to be given the testimony of a witness when only

[5]Although a recommendation of censure or removal by the Commission on Judicial Qualifications is not self-effectuating, the Commission does possess fact-finding and recommendatory powers which represent an allocation of judicial functions to the Commission by the Constitution. Thus when we receive a petition challenging the recommendation of the Commission, we deem it proper to treat it as a petition for a writ of review. (Code Civ. Proc., § 1067.) Code of Civil Procedure section 1068 provides: "A writ of review may be granted . . . when an inferior tribunal, board, or officer, exercising judicial functions, has exceeded the jurisdiction of such tribunal, board, or officer, and there is no appeal, nor, in the judgment of the court, any plain, speedy, and adequate remedy."

the written record is before a reviewing body," the Commission may properly "give great weight to the action of the [special masters]," who, having heard the presentation of evidence were "in a better position than the [Commission] to pass upon the truthfulness of the testimony." (*McKinney* v. *State Bar* (1964) 62 Cal.2d 194, 196 [41 Cal.Rptr. 665, 397 P.2d 425].)

We must also decide the appropriate standard for this court to employ in reviewing a recommendation by the Commission. Were this recommendation of independent force and effect absent further action by this court, our review of the evidentiary basis for that recommendation might properly be limited to a determination whether the Commission's findings of fact were supported by substantial evidence. Under such a standard of review, we would not be free to disregard the Commission's findings merely because the circumstances involved might also be reasonably reconciled with contrary findings of fact. (Cf. *People* v. *Mosher* (1969) 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659].) Procedures in State Bar matters offer an alternative standard—an independent review of the record by this court. ■ However, the power to retire a judge for disability or to censure or remove a judge for misconduct is, of course, contingent on the Commission having so recommended (Cal. Const., art. VI, § 18), and is therefore more limited than our power to commence proceedings on our own motion to disbar or suspend an attorney. (See Bus. & Prof. Code, § 6107; *In re Hallinan* (1954) 43 Cal.2d 243, 253-254 [272 P.2d 768].) ■ Nevertheless, since the ultimate, dispositive decision to censure or remove a judge has been entrusted to this court, we conclude that in exercising that authority and in meeting our responsibility we must make our own, independent evaluation of the record evidence adduced below. After conducting such a review we may then decide as a question of law whether certain conduct, which we may have found as a fact to have occurred, was "wilful misconduct in office" or "conduct prejudicial to the administration of justice that brings the judicial office into disrepute." (Cal. Const., art. VI, § 18.) Finally, it is to be our findings of fact and conclusions of law, upon which we are to make our determination of the ultimate action to be taken, to wit, whether we should dismiss the proceedings or order the judge concerned censured or removed from office.

Having clarified what we consider to be the proper institutional role of this court vis-à-vis the Commission and the special masters in an inquiry, we turn to the instant proceeding. It should be noted initially that the masters did apply the proper standard of proof in preparing their findings of fact. The masters' formal findings contain four separate references to

a "clear and convincing evidence" standard of proof in holding certain allegations not to have been proven.

Although its conclusions of law differed, the Commission's findings of fact paralleled the masters' findings. The Commission adopted as its own all but a few words of the masters' findings relative to the first five counts of the notice of formal proceedings, containing 22 of the 23 specifications of misconduct by petitioner. Where the Commission's findings in regard to these specifications did differ from the masters', they reflected the Commission's quite proper determination to focus on an *objective* appraisal of petitioner's conduct in terms of the effect of such conduct on the administration of justice. The masters were more concerned with the *subjective* motivations of petitioner in engaging in specified conduct, and with the *subjective* appraisal of his motivations by the persons directly affected by the specified conduct. It should be emphasized that there were no significant differences in the Commission's and the masters' determinations of whether or not the conduct alleged to have occurred in the 23 specifications did in fact occur. In no instance did the Commission find to have occurred conduct alleged in a particular specification, which allegation the masters had previously found not proven.

The specifications found by the Commission to have been proven other than that of count six generally concerned crude behavior and vulgar language which petitioner used in dealing with various professional associates, employees and officers of the court. Petitioner was found to have prodded a deputy public defender with a "dildo" during a conference in chambers one morning, and later that day to have referred to this incident twice in open court so as to curtail the victim's cross-examination of two witnesses. Petitioner was found to have approached a court commissioner from behind in a public corridor of the hall of justice and to have grabbed this victim's testicles. Petitioner was found on two occasions to have made lustful references to his female clerk, once while in chambers in the presence of a group of professional associates. Petitioner was found to have habitually used vulgar and profane language in his conversations with this clerk, and on two occasions to have used profane terms of personal abuse in reprimanding her and another woman employed by the court. Petitioner was also found to have invited two female attorneys into his chambers wherein he discoursed on the salacious nature of the evidence adduced in criminal cases concerning homosexual acts and rape, punctuating his commentary with profane terms for bodily functions.[6]

---

[6]The Commission's findings as to all specifications determined by the Commission to have been proven other than the specification of count six (see fn. 7, *infra*) are as follows:

The only substantive difference between the masters' and the Commission's findings arose in relation to count six, which set forth the 23d and

---

"FINDINGS

"1. Respondent is and since December 30, 1966, has been a judge of Municipal Court of the Los Angeles Judicial District.

"FINDINGS (COUNT ONE A)

"2. On the morning of January 29, 1971, Deputy District Attorney G. and Deputy Public Defender David E. were invited into Judge Geiler's chambers by the clerk, Burt Martinez. After Mr. G. and Mr. E. had entered chambers Judge Geiler appeared from the vicinity of the filing cabinet holding a battery-operated object resembling a penis and sometimes referred to as a 'dildo.'

"The object was thrust by Judge Geiler into the area of Mr. E.'s buttocks touching his body. Mr. E. joined the others in Judge Geiler's chambers in general laughter concerning this incident.

"In the morning session on that same date following the above incident and during the course of the preliminary hearing in *People* v. *Hall*, A-172, 876 (Exh. 3), Judge Geiler interrupted cross-examination by Mr. E. as follows:

'MR. E: One or two questions, your Honor, then I won't take any more of your time on this case.

'THE COURT: Get the machine out.

'THE CLERK: The battery?

'THE COURT: The battery.

'MR. E: I have no further questions, your Honor.'

"In the afternoon session during the preliminary hearing in *People* v. *Parks*, A-268-529 (Exh. 4), after an objection by Deputy District Attorney G. to a question by Deputy Public Defender David E., the following occurred:

'THE COURT: It's immaterial whether it was or it wasn't. He's not charged with anything earlier in the morning at 7:00 o'clock.

'Goes to good faith. Suppose it wasn't.

'It had been but it turned out that he had the thief. Ha, ha, ha. Shove it. That's what you're thinking about. You're convincing me more every moment.

'Did you get those batteries?

'THE CLERK: I'm charging it up. I've got a bigger one. Fifteen volts.

'THE COURT: David, we've got a fifteen-volter in there now.

'THE CLERK: With a longer handle.

'THE COURT: Hurry, David. We got a fifteen-volt battery for you.

'MR. E: Okay. We're referring to that incident this morning, your Honor?

'THE COURT: No, the one that you're going to take home tonight.

'Go ahead.

'MR. E: I have no further questions of this officer, your Honor.'

"The above quoted remarks of Judge Geiler were intended to and did have the effect of curtailing defense cross-examination during the Hall and Parks matters by means of implied threats of embarrassment and ridicule to Deputy Public Defender E.

". . . . . . . . . . . . . . . . . .

"FINDINGS (COUNT ONE B)

"3. In the fall of 1970, Mr. M., a traffic court commissioner, was engaged in a conversation in a hallway on the seventh floor of the Hall of Justice. Judge Geiler

final specification of misconduct in the original notice. Count six charged: "In nine preliminary hearings, you have arbitrarily and capriciously relieved the public defender and appointed private counsel. . . . In none

approached Commissioner M. from behind, reached under his crotch, and grabbed him by the testicles, causing Commissioner M. so much pain that he almost passed out. Nevertheless, Commissioner M. considered the conduct to be friendly horseplay.

"  .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

### "FINDINGS (COUNT THREE A)

"4. In the summer of 1969, at a time when five to six men were in Judge Geiler's chambers, Mrs. P., his court clerk, entered the Judge's chambers at his request. Shortly thereafter she left. As she was leaving, Judge Geiler stated, 'How would you like to eat that?' His question referred to Mrs. P. This comment was a crude effort at humor and part of an established course of conduct.

"  .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

### "FINDINGS (COUNT THREE B)

"5. On occasions during the early part of 1970, Judge Geiler telephoned his clerk, Mrs. P., and gave her the following instruction with reference to the cases and persons in his courtroom: 'Get the mother fuckers ready. I will be there shortly.' This type of language was typical of the vocabulary utilized in their conversations.

"  .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

### "FINDINGS (COUNT THREE C)

"6. In the early part of 1970, Judge Geiler occasionally asked Mrs. P., 'Did you get any last night?' This comment was a crude effort at humor and part of an established course of conduct.

"  .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

### "FINDINGS (COUNT THREE D)

"7. In March of 1970 on an occasion when Mrs. P. returned to court late from her lunch, Judge Geiler told her that she was 'nothing but a fucking clerk' and that she was to do exactly as she was told.

"  .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

### "FINDINGS (COUNT THREE G)

"8. On November 10, 1970, Judge Geiler, while in the office of Mrs. E., the calendar court coordinator for the municipal court, used the following language in reprimanding Mrs. E: 'son-of-a-bitch,' 'bitch,' and 'fucking clerk.' Judge Geiler also stated, 'No fucking clerk is going to keep time on me' or 'keep track of me,' and 'Don't you ever forget that you are just a fucking clerk.'

"  .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

### "FINDINGS (COUNT THREE H)

"9. Judge Geiler was introduced to a female attorney, Mrs. C. at a Christmas party at the office of Mr. F., also an attorney. On that occasion, outside Mrs. C's presence, Mr. F. asked Judge Geiler to help Mrs. C. in criminal matters because of her inexperience.

"On March 17, 1971, Mrs. C. appeared in Judge Geiler's court to conduct a preliminary hearing. Mrs. W., another female attorney, sat at the counsel table with her throughout the preliminary hearing. Upon the completion of that matter Judge Geiler invited Mrs. W. and Mrs. C. into chambers to discuss the handling of preliminary hearings.

"Judge Geiler spoke of the importance of the religion of judges in predicting how

of these nine cases was there an assertion of a conflict of interest." The findings of the Commission as to count six are set out in the margin.[7]

The Commission's findings as to count six are substantially identical to those of the masters save for the final two paragraphs. The masters had found mutual hostility between petitioner and the public defender's office;

they will rule on a matter. However, the major part of the Judge's conversation, a monologue which lasted approximately ten to twenty minutes, was rambling and disjointed. The only thread tying the conversation together was the theme of sex. For example, Judge Geiler told of a gang-rape by 'hot-blooded' Mexicans and of a judge who had vomited upon surreptitiously witnessing a homosexual act in the lavatory at the May Company. Judge Geiler also discussed other homosexual acts and degrees of penetration in rape cases, all with apparent relish at the salacious nature of the subject matter. He used 'street language' such as, 'shit' and 'fuck,' in discussing cases. . . ."

[7]"In the nine preliminary hearings specified in COUNT SIX of the Notice of Formal Proceedings the Public Defender was relieved as counsel. The respective defendants were eligible for representation by the Public Defender and the Public Defender's office was willing to represent and was appearing for each defendant. In the eight escape cases, Judge Geiler made a preliminary statement from the bench regarding his sentencing policy on escape cases where there was no evidence of violence or damage to property.

"In each case the defendant advised the court of his desire to plead guilty to a misdemeanor, but the Public Defender refused to plead the defendant guilty for the following reasons:

"(1) *Hakes*—The Public Defender wanted to consolidate this matter with other pending superior court cases so that defendant might spend less time in jail.

"(2) *Cole*—No statement was made to show any reason for the Public Defender's reluctance.

"(3) *Dominguez*—Uncertainty as to the effect of a guilty plea on defendant's parole status.

"(4) *Marquardt*—Refusal of Judge Geiler to make a record of the plea bargain.

"(5) *Oderda*—Uncertainty as to the effect of a guilty plea on defendant's parole status.

"(6) *Saldate*—The records of the proceedings before Judge Geiler do not reflect whether the Public Defender made any statement as to whether or not Saldate would plead guilty or the reasons why he should not do so, nor whether an opportunity was afforded to express the Public Defender's position.

"(7) *Ramirez*—The Public Defender and the District Attorney agreed to a lesser sentence because of mitigating circumstances. Judge Geiler refused but subsequently acceded to the same sentence after the substitution of private counsel.

"(8) *Deever*—Refusal of Judge Geiler to make a record of the plea bargain.

"(9) *Ricketts*—Judge Geiler refused to give the Public Defender additional time to research a possible defense suggested by the defendant.

"There was no evidence to show that there was a conflict of interest between the public defender and the defendants.

"In each case, private counsel was appointed at the request of the defendant for the purpose of the plea only and without compensation. Thereafter, each defendant entered a guilty plea in compliance with '*IN RE TAHL.*'

the Commission found petitioner responsible for this hostile relationship. The Commission additionally found that petitioner's substitutions of counsel were the direct result of petitioner's hostile attitude toward deputy public defenders.

We have made a detailed review of the full record and independently find upon clear and convincing evidence in accord with the findings of the Commission, including the findings as to the specification of count six. We adopt the Commission's findings as our own.

The Commission concluded on its findings that each of the proven specifications involved conduct constituting "wilful misconduct in office" and "conduct prejudicial to the administration of justice that brings the judicial office into disrepute." With the qualifications subsequently noted, we reach similar conclusions.

The ultimate standard for judicial conduct must be conduct which constantly reaffirms fitness for the high responsibilities of judicial office. It is immaterial that the conduct concerned was probably lawful, albeit unjudicial, or that petitioner may have perceived his offensive and harassing conduct as low-humored horseplay.

The first two canons of the Code of Judicial Conduct proposed in 1972 by the American Bar Association's Special Committee on Standards of Judicial Conduct emphasize the importance of appraising alleged judicial misconduct objectively rather than subjectively. Canon One declares: "a

---

"After the pleas, the defendants in the escape cases received sentences ranging from 10 to 45 days in county jail, consecutive. Defendant Dominguez pleaded guilty to misdemeanor possession of marijuana and was placed on probation and fined $100. No evidence was offered to show that any of the defendants were innocent of the charges.

"Judge Geiler had a hostile attitude and bias toward members of the Public Defender's office. As a result, some members of the Public Defender's office were hostile towards Judge Geiler. Since 1970 the Public Defender's office has attempted to limit the tour of duty of the Deputy Public Defenders assigned to Judge Geiler's court to a period of one week. Four of the five Deputy Public Defenders who testified regarding their being relieved as counsel by Judge Geiler had been admitted to practice law for periods of time ranging from two to four months at that time.

"Deputy Public Defenders were required by office policy to obtain approval from a supervisor before pleading a defendant guilty to a misdemeanor at the time of a preliminary hearing in any municipal court. In eight of the foregoing cases, the Deputy Public Defender had a valid reason for refusing to accede to Judge Geiler's desire for an immediate guilty plea. However, because of Judge Geiler's preconceived bias against Deputy Public Defenders and his professed desire to expedite the administration of justice even at the expense of defendants' constitutional rights, Judge Geiler initiated and carried out the foregoing substitutions of counsel."

judge should uphold the integrity and independence of the judiciary." The accompanying text adds: "A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved." Canon Two speaks for itself: "A judge should avoid impropriety and *the appearance of impropriety* in *all* his activities." (Italics added.)

The preface to the proposed Code of Judicial Conduct concludes: "The canons and text establish mandatory standards unless otherwise indicated. It is hoped that all jurisdictions will adopt this Code and establish effective disciplinary procedures for its enforcement." California is fortunate in that it need not formally adopt the proposed code in order to hold its judiciary to the high standard of conduct the public and the bar are entitled to expect of the judicial branch of government.

The Commission on Judicial Qualifications was created by constitutional amendment in 1960, when new section 10b was added to article VI. The proposition establishing the Commission found its way to the ballot in response to a demonstrated need to insure that those who sit in judgment in this state are both fit and able to discharge their responsibilities. One of the most dedicated and persuasive proponents of the Commission was Chief Justice Phil S. Gibson of this court.[8]

We had earlier held that the State Bar lacked jurisdiction over judges. (*State Bar of California* v. *Superior Court* (1929) 207 Cal. 323 [278 P. 432].) Due to the unwieldiness of legislative impeachment as a means of imposing judicial discipline, the bar of this state had been held to a higher standard of conduct than the bench—in reverse of the dictates of common sense and sound legal policy. The Commission provided an innovative and effective alternative to the impeachment process.

Although formal proceedings of the Commission have been few, the potentiality of such proceedings has proven to be the vital element of the Commission's efficacy. Each year since the establishment of the Commission the possibility of an inquiry and ultimately removal from office has led several unfit or disabled judges to remove themselves from the active ranks of the judiciary. In contrast to the low profile of most of its work, the California Commission on Judicial Qualifications, the first such commission created in the United States, has itself been much publicized as a model

---

[8]See Gibson, *For Modern Courts* (1957) 32 State Bar J. 727, 733-735. See generally Frankel, *Judicial Conduct and Removal of Judges for Cause in California* (1962) 36 So.Cal.L.Rev. 72; Frankel, *Removal of Judges: California Tackles an Old Problem* (1963) 49 A.B.A.J. 166.

for other states anxious to share California's reputation for an outstanding judicial system.[9]

This court has considered disciplinary recommendations from the Commission on only five prior occasions. In the first instance, the Commission recommended removal. Without commenting on the validity of the Commission's findings of fact, we rejected the recommendation of removal of the judge concerned. (*Stevens* v. *Commission on Judicial Qualifications* (1964) 61 Cal.2d 886 [39 Cal.Rptr. 397, 393 P.2d 709].) At that time, however, our Constitution (art. VI, § 10b) authorized removal as the sole disciplinary measure, and limited the grounds for imposing discipline on a judge to "willful misconduct in office or willful and persistent failure to perform his duties or habitual intemperance."[10]

In 1966 a second constitutional amendment concerning the Commission on Judicial Qualifications repealed section 10b and added new section 18 to article VI (see fn. 1, *supra*), thereby broadening the grounds for removal of a judge and adding the intermediate disciplinary option of public censure. Since 1966 this court has on four occasions adopted the recommendation of the Commission that a judge be publicly censured for "conduct prejudicial to the administration of justice that brings the judicial office into disrepute." (*In re Chavez* (1973) 9 Cal.3d 846 [109 Cal.Rptr. 79, 512 P.2d 303]; *In re Sanchez* (1973) 9 Cal.3d 844 [109 Cal.Rptr. 78, 512 P.2d 302]; *In re Glickfeld* (1971) 3 Cal.3d 891 [92 Cal.Rptr. 278, 479 P.2d 638]; *In re Chargin* (1970) 2 Cal.3d 617 [87 Cal.Rptr. 709, 471 P.2d 29].)

As indicated above, the Commission in the instant matter concluded that the conduct proven in the previously discussed specifications constituted "wilful misconduct in office" and "conduct prejudicial to the administration of justice that brings the judicial office into disrepute." As we have noted above, the second ground for imposing discipline was added to the Constitution in 1966. ■ We believe this mandates our construing "wilful misconduct in office" as connoting something graver than the "lesser included offense" of "conduct prejudicial to the administration of justice

---

[9]Chief Justice Roger J. Traynor stated in an address to the Virginia State Bar Association: "When a bench can quit itself of a burdensome member through such a commission, it gains as much as the Bar and the public. It reaps added benefits from each judge's quickened awareness that he must meet reasonable standards of competence and behavior in relation to his office." Traynor, *Who Can Best Judge the Judges?* (1967) 42 State Bar J. 225, 239. See also A.B.A., The Improvement of the Administration of Justice (5th ed., 1971) at pp. 57-58; Frankel, *Judicial Ethics and Discipline for the 1970s* (1970) 54 Judicature 18.

[10]See Frankel, *Judicial Discipline and Removal* (1966) 44 Tex.L.Rev. 1117, 1129-1130.

that brings the judicial office into disrepute." The more serious charge should be reserved for unjudicial conduct which a judge acting in his judicial capacity commits in bad faith, while the lesser charge should be applied to conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office.[11]

■ Viewed in this light, we conclude that the following specifications of petitioner's vulgar and profane conduct constituted "wilful misconduct in office:" petitioner's brandishing of the "dildo" and petitioner's subsequent remarks, found by the Commission to have been made with the intent of curtailing cross-examination by the victim, and petitioner's profane and abusive reprimanding of two court employees. We consider the remaining proven instances of petitioner's vulgar conduct to have been "conduct prejudicial to the administration of justice that brings the judicial office into disrepute."

Turning to the final specification of misconduct embodied in count six, we regard the Commission's conclusions[12] to be worthy of incorporation in this opinion:

"We conclude that Judge Geiler violated Code of Civil Procedure section 284 when he relieved the Deputy Public Defenders in the eight cases (excluding *Cole*). While legal precedent in this area is scant, any excuse for Judge Geiler's noncompliance with Code of Civil Procedure section 284 was precluded by the fact that he did not act in good faith. Judge Geiler interfered with the attorney-client relationship between the public defenders and their clients. All of the cases were the type which probably would have become misdemeanors by sentence had the defendants been held to answer and pleaded guilty or been convicted in the superior court. In these cases, no actual prejudice was suffered by any of the defendants. Nevertheless, Judge

---

[11]The lesser charge of "conduct prejudicial to the administration of justice that brings the judicial office into disrepute" would also apply to wilful misconduct out of office, i.e. unjudicial conduct committed in bad faith by a judge not then acting in a judicial capacity. It should be emphasized that our characterization of one ground for imposing discipline as more or less serious than the other does not imply that in a given case we would regard the ultimate sanction of removal as unjustified solely for "conduct prejudicial to the administration of justice which brings the judicial office into disrepute."

[12]It is significant that all nine members of the Commission concurred in these conclusions. All the findings of fact of the Commission, and all the conclusions of law relative to each proven specification of misconduct were adopted by unanimous resolution. The only nonunanimous act of the Commission was its recommendation of removal, for which seven members of the Commission voted. Two members of the Commission voted to recommend censure.

Geiler's bad faith interference with the attorney-client relationship in violation of Code of Civil Procedure section 284 constituted conduct prejudicial to the administration of justice and wilful misconduct in office.

"During the last few years there has been great public concern over the problem of trial court delay and congestion. It may be argued that Judge Geiler was attempting to respond to this crisis in the court system by encouraging pleas of guilty in minor cases which would undoubtedly result in a misdemeanor disposition in the superior court. However, a judge must decide each case on its own individual merits. In his misguided attempt to expedite justice, Judge Geiler did not do so. By his own testimony, he had biased preconceptions as to public defender cases. This precluded good faith consideration of each of these eight cases on its own merits.

"Judge Geiler's refusal to permit plea bargains in the *Marquardt* and *Deever* cases to be placed 'on the record' was petty, unreasonable and contrary to the rule set forth in *People* v. *West*. Judge Geiler's refusal to allow the Public Defender in the *Ricketts* case additional time to investigate a possible defense was arbitrary and made in callous disregard of the defendant's interests. Judge Geiler's replacement of the Public Defenders in the *Dominguez* and *Oderda* cases in effect precluded the investigation of possible parole consequences of guilty pleas; as such these actions also were made in callous disregard of the defendants' interests. Judge Geiler's summary dismissal of the Public Defender in the *Saldate* case for no apparent reason and without any discussion whatsoever was arbitrary, unjust, and capricious. In the *Ramirez* case, Judge Geiler's removal of the Public Defender who insisted on a lesser sentence, coupled with the Judge's subsequent imposition of the same sentence, was arbitrary and capricious. Finally in the *Hakes* case, Judge Geiler's removal of the Public Defender prevented the reasonable consolidation of this matter with other pending superior court cases.

"Thus we conclude that the actions of Judge Geiler in these eight cases violated Code of Civil Procedure section 284, interfered with the attorney-client relationship and were made in bad faith.

"The foregoing conduct of Respondent constituted wilful misconduct in office and conduct prejudicial to the administration of justice that brings the judicial office into disrepute."

We agree with the Commission that the conduct charged in count six was not only unjudicial but unlawful as well. (Cf. *Smith* v. *Superior Court* (1968) 68 Cal.2d 547 [68 Cal.Rptr. 1, 440 P.2d 65].) We also are in accord

with the Commission in concluding, contrary to the special masters, that petitioner acted in "bad faith." However, we feel this last conclusion requires elucidation.

By "bad faith," we do not mean to imply that petitioner sought to harm the interests of the defendants involved. Rather, we mean that in indulging his petty animosity toward deputy public defenders, and in culmination of a pervasive course of conduct of overreaching his authority over subordinates, petitioner intentionally committed acts which he knew or should have known were beyond his lawful power. The resulting misconduct entailed the most insidious kind of official lawlessness—disregard for the statutory and constitutional rules by which a society of millions and a heritage of centuries have sought to preserve fundamental fairness within a legal system which cannot escape the inherent imperfections of mankind.

No more fragile rights exist under our law than the rights of the indigent accused; consequently these rights are deserving of the greatest judicial solicitude. The ideal of our legal system is that the judicial should be equated with the just. Such an ideal cannot be achieved if one man clothed with judicial power may ignore with impunity such a basic institutional mandate as the sanctity of the attorney-client relationship merely because the attorneys are young deputy public defenders and their clients are indigent.

It is immaterial whether petitioner's abuse of power resulted in just or unjust treatment for any given defendant. It is undisputed that petitioner bore no ill will towards the individual defendants enumerated in count six. Petitioner's bad faith was directed towards our legal system itself; his arbitrary substitutions of counsel because of his personal beliefs as to the defendants' guilt and his personal hostility to their counsel smacks of an inquisitorial intent to serve imagined truth at the expense of justice. Our adversary system of justice and our elaborate procedure for the prosecution of alleged criminals represents an institutional recognition of the fallibility of the individual. Much as our political system apportions power among jealous branches of government, so within the judicial branch we have striven to disperse the functions of the judicial process among many adverse participants in the hope that the institutions of our legal system will bear a collective capacity for justice and righteousness which no single mortal can achieve. It is this commitment to institutional justice which petitioner's individual conduct threatens to corrupt. Risk of recurrence of such conduct cannot be tolerated.

After reviewing the entire record and considering all the facts and circumstances, we have concluded that the recommendation of the Commission should be adopted. We therefore order Judge Leland W. Geiler of the Municipal Court of the Los Angeles Judicial District of Los Angeles County removed from office. This order is final forthwith.[13]

As indicated above, before the advent of the Commission on Judicial Qualifications the bar of this state was held to a higher standard of conduct than the bench. This anomaly has since been rectified and the reverse is now true. We recognize that petitioner's removal from office is required more by the high standards of judicial office than by his personal failings. Much evidence was adduced before the Commission of petitioner's diligence in the work of the law, and his unjudicial conduct cannot be said to amount to moral turpitude, dishonesty or corruption. (Cf. Bus. & Prof. Code, § 6106.) We therefore further order that despite his removal from judicial office Leland W. Geiler shall if otherwise qualified be permitted to practice law in the State of California. (See Cal. Const., art. VI, § 18, subd. (d).)

Petitioner's application for a rehearing was denied November 15, 1973.

---

[13]This is the first instance in which we have removed a judge from office and we do so only after careful consideration of all matters, including the standards of conduct to which members of the judiciary must conform, the nature of our review of proceedings before the masters and the Commission, and the full record of those proceedings as reported to this court. The record discloses that the masters rendered their report 120 days after their appointment. During the hearings, which consumed 21 court days, they heard a total of 73 witnesses whose testimony is reported in 3,193 pages of transcript. Thereafter the Commission, after careful deliberations over a 56-day period, made and reported its findings of facts, conclusions of law and recommendations. Both the Commission and this court were required to review the full transcript in performance of their responsibilities to make independent findings on a conflicting factual record.