IN THE SUPREME COURT OF NORTH CAROLINA

No. 347A23

Filed 22 March 2024

IN RE INQUIRY CONCERNING A JUDGE, NOS. 22-073 & 22-395

ANGELA C. FOSTER, Respondent

This matter is before the Court pursuant to N.C.G.S. §§ 7A-376 and -377 upon a recommendation by the Judicial Standards Commission entered on 21 December 2023. The Commission recommends that respondent Angela C. Foster, a Judge of the General Court of Justice, District Court Division, Judicial District 18, be suspended for conduct in violation of Canons 1, 2A, 2B, 3A(3), 3A(5), 3B(1), and 3C of the North Carolina Code of Judicial Conduct and for conduct prejudicial to the administration of justice that brings the judicial office into disrepute in violation of N.C.G.S. § 7A-376. This matter was calendared for argument in the Supreme Court on 15 February 2024 but determined on the record without briefs or oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure and Rule 2(c) of the Rules of Supreme Court Review of Recommendations of the Judicial Standards Commission.

*No counsel for Judicial Standards Commission or respondent.*

PER CURIAM.

The issue before the Court is whether District Court Judge Angela C. Foster,

respondent, should be suspended for violations of Canons 1, 2A, 2B, 3A(3), 3A(5), 3B(1), and 3C of the North Carolina Code of Judicial Conduct—violations which amounted to conduct prejudicial to the administration of justice that brings the judicial office into disrepute in violation of N.C.G.S. § 7A-376(b). Respondent entered a stipulation pursuant to Rule 18 of the Rules of the Judicial Standards Commission (Stipulation) in which respondent stipulated to the facts surrounding her conduct and the disciplinary recommendation that she be suspended for 120 days without compensation.

On 7 July 2022, Commission Counsel filed a Statement of Charges against respondent in Inquiry No. 22-073. The charges alleged that respondent had engaged in conduct inappropriate to her office when she called the Wake County Magistrate's Office on 3 March 2022. During the call, respondent utilized her judicial title to inquire about the custody status of her son without disclosing the familial relationship. Further, respondent yelled at the magistrate and demanded a bond reduction based upon inaccurate and incomplete information.

Before Inquiry No. 22-073 was resolved, Commission Counsel filed another Statement of Charges against respondent in Inquiry No. 22-395 on 23 February 2023. The charges alleged that respondent had demanded, without notifying her chief district court judge, that an assistant district attorney (ADA) and a presiding magistrate close their administrative courtroom for her own use, despite an active administrative order mandating that it stay open. The conduct resulted in over one

hundred cases being continued.

Respondent filed her answer to Inquiry No. 22-073 on 8 August 2022 and her answer to Inquiry No. 22-395 on 29 March 2023. On 27 July 2023, Commission Counsel and respondent entered into the Stipulation containing joint evidentiary, factual, and disciplinary stipulations as permitted by Rule 18 of the Rules of Judicial Standards Commission that tend to support the decision to suspend respondent. The Commission heard the matter on 11 August 2023, and the Stipulation was entered into the record without objection. The Commission initially rejected the Stipulation on 11 August 2023, but the Commission later accepted the Stipulation on 12 October 2023.

## I.    Recommendation of the Judicial Standards Commission

## A. Findings of Fact

The recommendation of the Commission contains the following stipulated findings of fact:

> 1. In Inquiry Number 22-073, the parties stipulate to the following facts:
>
>    a. On 3 March 2022, at 10:48pm, the Wake County Magistrates' Office received a phone call from an individual listed as "Foster, Angela" on the caller identification. At the time, Magistrate Lauren May was on duty along with three other magistrates.
>
>    b. Magistrate May answered this phone call. The person on the other end of the line identified herself as Respondent, indicated that she was a Guilford County District Court Judge, and inquired if a defendant named Alexander Pinnix was in Wake

County custody. Respondent appeared annoyed but did not seem to be directing it at Magistrate May at the time. At no point during this introduction did Respondent identify her relationship with Mr. Pinnix.

c.  After looking in their system, Magistrate May was able to confirm for Respondent that Mr. Pinnix was in Wake County custody on a $1000 secured bond. In response, Respondent began speaking loudly at Magistrate May and requested that she change Mr. Pinnix's bond to a written promise to appear.

d.  Magistrate May was confused by Respondent's response given that Respondent was not a Wake County judge but did not want to come across as rude, so she requested to put Respondent on a brief hold to look at Mr. Pinnix's file. After reviewing the file, Magistrate May found that Mr. Pinnix was being held on Wake County charges of resisting a public officer and misdemeanor breaking or entering that had been sworn out before a Wake County magistrate with a bond set by a different Wake County magistrate.

e.  Before returning to the call, Magistrate May enlisted the assistance of her three colleagues who had been nearby her cubicle for an unrelated reason. All four magistrates concluded that based on their training and experience that Respondent had no reason to be involved with the case as an out of county judge and that the situation sounded strange.

f.  When Magistrate May returned to the call, she asked Respondent to explain her involvement with Mr. Pinnix's case and provide a basis for changing the bond. As a result of Respondent's response, Magistrate May explained that since she had not issued the charges or set the bond, she did not feel comfortable altering the bond of another magistrate.

g.  Respondent then requested the telephone numbers of the magistrates who had been involved with Mr. Pinnix's case so that she could call them at home and ask them to change the bond. Magistrate May declined to provide this information but suggested that Respondent could call Wake County Chief District Court Judge Ned Mangum to discuss the situation. Respondent became extremely angry at this suggestion, indicated that she would never dream of calling a district court judge at that time of night, and again demanded Magistrate May alter the bond. Magistrate May suggested that Respondent could wait until morning to call Judge Mangum, however this suggestion caused Respondent to become even more upset. By this point, Magistrate May's three co-workers could hear Respondent yelling through the phone receiver at her.

h.  Respondent continued requesting Magistrate May to change Mr. Pinnix's bond by saying that Mr. Pinnix had court in Guilford County the following morning on 4 March 2022, for a child custody case and that he needed to be present because the court was going to take away his children if he was not. She explained that Mr. Pinnix could not miss this court appearance, that calling Judge Mangum in the morning would already be too late, and stressed that the bond need to be changed that evening.

i.  Magistrate May then muted the phone and again requested the assistance of the other magistrates. At their suggestion, Magistrate May offered Respondent her Chief Magistrate's phone number. The phone call ended shortly thereafter. Respondent never contacted the Chief Magistrate regarding Mr. Pinnix's bond that evening.

j.  Due to the strange nature of the phone call, the amount of personal information Respondent had about Mr. Pinnix, and how upset Respondent had become, Magistrate May and her colleagues decided

to look up Respondent on the internet. After a brief search, they learned that Respondent was Mr. Pinnix's mother. At no point during the phone conversation did Respondent identify her familial relationship with Mr. Pinnix, but instead led Magistrate May to believe that Mr. Pinnix was a litigant in her courtroom. After making this discovery, Magistrate May wrote down her recollection of the phone call with Respondent and reported the incident to her Chief Magistrate.

k.  After investigating these claims, court documents showed that Mr. Pinnix did not have a history of failures to appear, nor did he have a Guilford County child custody case (or any other case) pending.

l.  The next morning, [4] March 2022, Magistrate Jordan Fly received a call from Respondent inquiring whether Mr. Pinnix was in the Wake County Detention Center. Magistrate Fly confirmed Mr. Pinnix was in the detention center under a $1000 secured bond, to which Respondent expressed surprise, stated she arranged for the bond to be posted, wondered why it was taking so long, and asked whether it was possible he was already released. Magistrate Fly again stated he was sure Mr. Pinnix was still in the Detention Center. During this call, Respondent did not identify herself as a judge or disclose the nature of her relationship to Mr. Pinnix.

2.  In Inquiry Number 22-395, the parties stipulate to the following facts:

a.  Chief District Court Judge Teresa H. Vincent issued an Administrative Order on 22 July 2022, stating, "In High Point, administrative traffic court and 3B waiver court will be combined into courtroom 3B. The Courtroom 3B shall be open Mondays and Fridays from 8:30am until 12:30pm." This Administrative Order was distributed to all High Point Courthouse employees, including judges,

when it went into effect.

b. On 1 November 2022, Respondent alerted Judge Vincent by text that her assigned courtroom for 7 November 2022, would not meet the needs of her Abuse, Neglect, and Dependency Court session. Respondent was scheduled to address a case on this date where both parents were charged with the murder of their child. The parents, both in custody, could not be in the courtroom at the same time, which in turn required extra security and staff to conduct this hearing. Additionally, recording capability was required, which only some of the courtrooms in High Point were equipped with.

c. In response to Respondent's request, Judge Vincent provided the option for her to take over Courtroom 3B once Administrative Court concluded as this courtroom could meet the needs of the hearing in question. Respondent replied expressing her concern that the courtroom would not be run "with the goal of finishing in an efficient manner." Judge Vincent replied, "I am sure they will finish court as soon as they can in order to handle other tasks." No other contingency plans were discussed.

d. Before court began on 7 November 2022, at approximately 8:30am, Respondent came to Courtroom 3B and informed the assigned ADA that she might need his courtroom. In response, the ADA informed her of the number of cases on his docket and reminded her of Judge Vincent's Administrative Order. During this conversation, the courtroom bailiff was nearby. Once Respondent left, the ADA made the magistrate presiding aware of the conversation then conducted the business of Administrative Court as usual.

e. After this conversation, Respondent returned to her assigned courtroom, 201, and informed everyone there that they would be moving to Courtroom 4C, a superior court courtroom. This was done by

Respondent without first getting approval from Judge Vincent and the Senior Resident Superior Court Judge.

f.  While Respondent was holding her district court session in Courtroom 4C, the Superior Court Trial Court Administrator ("the TCA") walked past and heard voices. When the TCA entered and realized what Respondent was doing, she asked why Respondent was there, to which Respondent replied, "Oh they didn't tell you either. . . I needed to use this courtroom." The TCA informed Respondent that she was not aware that anyone would be using the superior court courtroom then went to her office to call her supervisor, who in turn, informed Judge Vincent.

g.  At 9:37am, Judge Vincent confronted Respondent via text about her use of the superior court courtroom without permission, how that was not the plan they discussed, and ordered Respondent to vacate. Respondent responded claiming the bailiffs gave her permission to use this courtroom. When Judge Vincent asked the Sheriff's Office about this, they denied providing Respondent with such permission.

h.  Respondent left Courtroom 4C and returned to Courtroom 3B at approximately 10:00am to inform the ADA she needed his courtroom. The ADA told Respondent that he still had a full courtroom, but she told him to vacate. The courtroom bailiff was nearby during this conversation. As a result, the ADA informed the presiding magistrate of his conversation with Respondent and they proceeded to close down Administrative Court. This consisted of handling any case the ADA had already begun addressing and informing the remaining citizens that their cases would be continued, which the ADA notated on his docket. This resulted in more than one hundred cases being continued without being addressed which caused frustration to many

members of the public.

 i. After Administrative Court closed, the presiding magistrate went directly to speak with Judge Vincent to advise her of the incident because he did not want to get in trouble for closing court early in violation of the Administrative Order.

 j. After speaking with the presiding magistrate, Judge Vincent confronted Respondent via text at 10:57am about her directing Administrative Court to shut down without Judge Vincent's permission and in violation of her Administrative Order. Respondent denied this via text and stated that she only spoke to the clerk regarding the possibility of Administrative Court moving to Courtroom 4C, the superior court courtroom she did not have the authority to use, because they did not need the recording equipment. This allegation by Respondent could not be confirmed.

3. In mitigation, the Commission found Respondent is remorseful for her actions in these matters and has accepted responsibility for her Code violations.

4. In aggravation, the Commission found Respondent (1) was previously issued a censure by the North Carolina Supreme Court, *In re Foster*, 373 N.C. 29 . . . (2019), and (2) while on notice for Inquiry Number 22-073, Respondent engaged in the conduct outlined in Inquiry Number 22-395.

## B. Conclusions of Law

Based upon the foregoing findings of fact, the Commission made the following conclusions of law:

1. Canon 1 of the Code of Judicial Conduct sets forth the broad principle that "[a] judge should uphold the integrity and independence of the judiciary." To do so, Canon 1 requires that a "judge should participate in establishing, maintaining, and enforcing, and should

personally observe, appropriate standards of conduct to ensure that the integrity and independence of the judiciary shall be preserved."

2. Canon 2A of the Code of Judicial Conduct generally mandates that "[a] judge should respect and comply with the law and should conduct [herself] at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

3. Canon 2B of the Code of Judicial Conduct instructs that "[a] judge should not allow the judge's family, social or other relationships to influence the judge's judicial conduct or judgment. The judge should not lend the prestige of the judge's office to advance the private interest of others except as permitted by [the] Code; nor should the judge convey or permit others to convey the impression that they are in a special position to influence the judge."

4. Canon 3 of the Code of Judicial Conduct governs a judge's discharge of his or her official duties.

5. Canon 3A relates to judges' adjudicative duties, with Canon 3A(3) requiring that a judge be "patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in the judge's official capacity. . ." and Canon 3A(5) requiring that a judge "dispose promptly of the business of the court."

6. Canon 3B pertains to judges' administrative duties, with Canon 3B(1) requiring a judge to "diligently discharge the judge's administrative responsibilities, maintain professional competence in judicial administration, and facilitate the performance of the administrative responsibilities of other judges and court officials."

7. Canon 3C concerns a judge's duty to "disqualify him or herself in a proceeding in which the judge's impartiality may reasonably be questioned. . ."

8. Upon the Commission's independent review of the stipulated facts in Inquiry Number 23-073 concerning Respondent's conduct towards Magistrate May relating to her son's bond, the Commission, by a unanimous 5-0 vote of the hearing panel concludes Respondent:

    a. failed [to] conduct herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary in violation of Canons 1 and 2A of the Code;

    b. allowed her family relationships to influence her judicial conduct or judgment in violation of Canon 2B of the Code;

    c. failed to remain patient, dignified, and courteous to all individuals she deals with in her judicial capacity in violation of Canon 3A(3) of the Code; and

    d. involved herself in a matter in which her impartiality could be reasonably questioned in violation of Canon 3C of the Code.

The Commission notes that Respondent conceded in the Stipulation these facts were sufficient to support the conclusions.

9. Upon the Commission's independent review of the stipulated facts in Inquiry Number 23-395 concerning Respondent's conduct towards the ADA and presiding magistrate in Administrative Court, forcing the continuances of over one-hundred cases before they were able to be addressed, the Commission, by a unanimous 5-0 vote of the hearing panel concludes Respondent:

    a. failed to conduct herself at all times in a manner that promotes public confidence in the integrity of the judiciary and impartiality of the judiciary in violation of Canons 1 and 2A of the Code;

    b. prevented another judicial official from disposing promptly of the business of the court in violation of

Canon 3A(5) of the Code; and

c. failed to diligently discharge her administrative responsibilities, maintain her professional competence in judicial administration, and facilitate the performance of the administrative responsibilities of other judges and court officials in violation of Canon 3B(1) of the Code.

The Commission notes that Respondent conceded in the Stipulation these facts were sufficient to support the conclusions.

10. The Commission further concludes, and accepts Respondent's admission, that the facts establish Respondent engaged in willful misconduct in office and conduct prejudicial to the administration of justice that brings the judicial office into disrepute in violation of N.C.[G.S.] § 7A-376(b). *See also* Code of Judicial Conduct, Preamble ("[a] violation of this Code of Judicial Conduct may be deemed conduct prejudicial to the administration of justice that brings the judicial office into disrepute.").

11. The North Carolina Supreme Court defined "willful misconduct in office" as "improper and wrong conduct of a judge acting in his official capacity done intentionally, knowingly and, generally in bad faith. It is more than a mere error of judgment or an act of negligence." *In re Edens*[,] 290 N.C. 299, 305 (1976). The Supreme Court further held in *In re Nowell*, 293 N.C. 235 (1977), while willful misconduct in office necessarily encompasses "conduct involving moral turpitude, dishonesty, or corruption," it can also be found based upon "any knowing misuse of the office, whatever the motive." *Id.* at 248. . . . "[T]hese elements are not necessary to a finding of bad faith. A specific intent to use the powers of the judicial office to accomplish a purpose which the judge knew or should have known was beyond the legitimate exercise of his authority constitutes bad faith." *Id.*

12. In reaching this conclusion, the Commission weighed Respondent's pattern of abusing her power, the guidance provided by precedent set by the North Carolina Supreme Court, and Respondent's willingness to accept responsibility for her actions.

13. The Commission stressed that Respondent was censured for abusing her power in the courtroom in *In re Foster*, 373 N.C. 29 . . . (2019), then proceeded to abuse her power again by misleading and bullying a magistrate in an attempt to have her son released from custody notwithstanding her previous public discipline. Then, after being put on notice and charged by the Commission in that matter, Respondent again abused her power by disregarding instructions from her chief district court judge and a valid administrative order, forcing more than one hundred cases to be continued without being addressed so that she could use a courtroom for her own purposes.

14. The Commission compared the facts at hand with those in *In re Hartsfield*, 365 N.C. 418, [431–32] (2012), where the respondent judge was issued the longest suspension (75-days) in the Commission's history for engaging in a pattern of transferring traffic tickets onto her dockets with the understanding that the tickets (issued to individuals including her friends, church members, law students, etc.) would be resolved by her with favorable outcomes. Similarly to Respondent, the respondent judge in that matter was also charged with engaging in a pattern of misconduct, entered a factual stipulation . . . . *Id.* [at 426.] . . . In conducting this weighing, the Commission determined that although the facts addressed in *In re Hartsfield* were arguably more severe than any of those in Respondent's current or former matters to be addressed by the Court, Respondent's repeated course of conduct over time called for a more severe sanction.

15. However, similar to the comparative analysis the Court conducted in *In re Hartsfield*, the Commission also compared Respondent's conduct to that addressed by

cases resulting in judges' removals from office and found that Respondent's conduct did not seem to rise to that level. *See In re Peoples*, 296 N.C. 109 . . . (1978) (where the respondent judge (1) engaged in a pattern of addressing criminal cases without calendaring them, noticing the district attorney, or entering judgment in open court and (2) on several occasions, accepted money from defendants to "take care of" traffic citations); *In re Martin*[,] 302 N.C. 299 . . . (1981) (where the respondent judge (1) initiated ex parte communications with two twenty-one year old female defendants and attempted to force himself on them and (2) heard his own failure to stop at a stop sign case[ ]); *In re Kivett*, 309 N.C. 635 . . . (1983) (where the respondent judge allowed his relationship with a bail bondsman, who provided the respondent judge with gifts and the use of his home for illicit sexual relations, to influence multiple court decisions); *In re Badgett*, 362 N.C. 482 . . . (2008) (where, after being censured and suspended in a prior case, the respondent judge made a defendant proceed pro se in a juvenile court hearing and ordered that defendant to pay spousal support despite the complaint not seeking it and turn over the keys of his truck to the Sheriff's Office, after which the respondent judge lied to investigators and tried to suggest to a Sheriff's deputy that they also lie); and *In re Belk*, 364 N.C. 114 . . . (2010) (where the respondent judge continued to serve on the board of directors for two companies despite receiving contrary ethics advice and, after his request to be relieved of his judicial duties to attend a board meeting was denied, confronted and yelled at his chief district court judge[ ]).

16. The Commission also acknowledged that prior to legislative changes in 2006, the Court only had the authority to censure or remove a judge. N.C.[G. S.] § 7A-377(b). Further, the Court has made it clear that the discipline imposed in any given case "will be decided upon its own facts." *In re Hardy*, 294 N.C. 90, 98 . . . (1978).

17. As a result, the Commission concludes, and Respondent

agrees that a suspension of 120 days without compensation is appropriate balancing the aforementioned factors.

18. The North Carolina Supreme Court in *In re Crutchfield*, 289 N.C. 597 (1975)[,] first addressed sanctions under the Judicial Standards Act and stated that the purpose of judicial discipline proceedings "is not primarily to punish any individual but to maintain due and proper administration of justice in our State's courts, public confidence in its judicial system, and in the honor and integrity of is judges." *Id.* at 602.

19. The Commission and Respondent acknowledge the ultimate jurisdiction for the discipline of judges is vested in the North Carolina Supreme Court pursuant to Chapter 7A, Article 30 of the North Carolina General Statutes, which may either accept, reject, or modify any disciplinary recommendations from the Commission.

## C. Recommendation

Based on the foregoing findings of fact and conclusions of law, the Commission, by unanimous vote of the five Commission members that comprised this matter's hearing panel, concurred in the recommendation to suspend respondent for a period of 120 days without compensation.

## II.    Analysis

The Court, upon recommendation of the Judicial Standards Commission, has the authority and responsibility to discipline judges by issuing a public reprimand, censure, suspension, or removal of a judge "for willful misconduct in office, willful and persistent failure to perform the judges' duties, habitual intemperance, conviction of a crime involving moral turpitude, or conduct prejudicial to the administration of

justice that brings the judicial office into disrepute." N.C.G.S. § 7A-376(b) (2023). The purpose of our judicial standards system is "to maintain due and proper administration of justice in our State's courts, public confidence in its judicial system, and the honor and integrity of . . . judges." *In re Crutchfield*, 289 N.C. 597, 602 (1975).

To that end, conduct prejudicial to the administration of justice includes "conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be, not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office." *In re Edens*, 290 N.C. 299, 305 (1976) (quoting *Geiler v. Comm'n on Jud. Qualifications*, 10 Cal. 3d 270, 284 (1973)). Further, conduct is prejudicial and constitutes willful misconduct when a judge intentionally, improperly, or wrongfully uses the power of the office with gross unconcern for his or her conduct and in bad faith. *In re Martin*, 295 N.C. 291, 301–02 (1978).

In reviewing recommendations of the Commission, the Court "acts as a court of original jurisdiction" and exercises independent judgment as to the disciplinary measures imposed on a judge. *In re Badgett*, 362 N.C. 202, 207 (2008) (quoting *In re Daisy*, 359 N.C. 622, 623 (2005)). Each case is decided solely on its own facts, *In re Martin*, 302 N.C. 299, 315–16 (1981), and the recommendation of the Commission is not binding on this Court, *In re Hartsfield*, 365 N.C. 418, 428 (2012). This Court may adopt the Commission's findings of fact if they are supported by clear and convincing evidence or may make its own findings. *Id.* In the same vein, this Court may adopt

the Commission's recommendation or exercise independent judgment as to the appropriate sanction. *In re Martin*, 295 N.C. at 301.

In this matter, we agree that the Commission's findings are supported by clear and convincing evidence, and we adopt them as our own. By extension, we agree with the Commission's conclusions that respondent's conduct violates Canons 1, 2A, 2B, 3A(3), 3A(5), 3B(1), and 3C of the North Carolina Code of Judicial Conduct, and is prejudicial to the administration of justice and brings the judicial office into disrepute in violation of N.C.G.S. § 7A-376(b).

Our guidepost in determining the appropriate sanctions is the impact of the conduct on public confidence in our judicial system and ensuring the honor and integrity of judges who serve the people of this state. *In re Crutchfield*, 289 N.C. at 602. The stipulations in this matter establish judicial conduct troubling enough to warrant suspension, and this Court has suspended judges where a pattern of problematic conduct has been identified. *See, e.g., In re Hartsfield,* 365 N.C. at 426–27, 431–32 (suspending a judge engaged in a pattern of transferring traffic tickets of friends and family to her docket with the understanding the tickets would be resolved with a favorable outcome). Here, respondent was also previously sanctioned for her conduct. *In re Foster*, 373 N.C. 29, 31-33, 40 (2019) (censuring respondent for holding a hearing without notice, placing a mother in jail without cause and then lecturing the mother's fifteen-year-old children in an effort to convince them to exercise visitation with their father). Further, while on notice of Inquiry No. 22-073, she

engaged in the conduct described in Inquiry No. 22-395. The stipulated conduct justifies the recommended discipline.

We appreciate respondent's cooperation with the Commission during the pendency of these proceedings, her candor, her acknowledgment of responsibility for her conduct, and her completion of additional training on ethics and professionalism. Respondent recognizes that her conduct warrants disciplinary consequences and agreed to accept the recommended disciplinary action. Weighing the severity and extent of respondent's misconduct against her acknowledgement and cooperation, we conclude that the Commission's recommendation of a 120-day suspension is appropriate and supported by the Commission's findings of fact and conclusions of law.

It is hereby ordered by the Supreme Court of North Carolina in conference that respondent Angela C. Foster be SUSPENDED for a term of 120 days without compensation for conduct in violation of Canons 1, 2A, 2B, 3A(3), 3A(5), 3B(1), and 3C of the North Carolina Code of Judicial Conduct and conduct prejudicial to the administration of justice that brings the judicial office into disrepute in violation of N.C.G.S. § 7A-376(b).