*CJP Supp. 181 Opinion
KAHN, Chairperson.
This disciplinary matter concerns Judge Patrick B. Murphy, a judge of the Los Angeles County Superior Court. The Commission on Judicial Performance, based on Judge Murphy’s absences from court from 1996 through 2000, charged Judge Murphy with persistent failure or inability to perform his judicial duties. Judge Murphy was also charged with failing to give his judicial duties precedence over all other activities and engaging in activities that interfered with the proper performance of his judicial duties, and with exhibiting a lack of candor to his presiding judge and failing to cooperate in the administration of court business. In addition, the commission charged Judge Murphy with malingering in that he “falsely claimed to be ill *CJP Supp. 182 and/or medically disabled for the purpose of continuing to collect [his] salary without performing [his] judicial duties.”
A panel of three justices, sitting as special masters, found that all the charges were supported by clear and convincing evidence. For the reasons set forth in this decision, the commission unanimously adopts the masters’ findings of fact and conclusions of law and removes Judge Patrick B. Murphy from the bench.
On May 4, 2001, the commission received a faxed document purporting to be a letter of resignation from Judge Murphy to Governor Davis. Trial counsel informs us that as of the afternoon of May 8, 2001, the governor’s judicial appointments secretary indicated that he did not have a letter of resignation from Judge Murphy. Accordingly, the commission believes that it is still within its authority to impose the discipline Judge Murphy merits, his removal from office. If it is determined that Judge Murphy has resigned prior to this order of removal, this decision shall be considered a public censure of former Judge Patrick B. Murphy and a bar from receiving any assignment, appointment, or reference of work from any California state court. 
PROCEDURAL HISTORY
On May 13, 1999, the commission sent Judge Murphy an investigation letter requesting that he respond to allegations of excessive absences. Judge Murphy responded with a letter first alleging that the complaint to the commission was an attempt by his political opponents to manipulate the commission. He then offered numerous medical explanations for his absences including a thyroidectomy, a congenital nonfusion of his spine, degenerative disc disease, cephalgia, sleep deprivation, stress, and “muscular pain, joint pain and abdominal pains” of increasing duration, intensity and frequency. In the course of the letter, Judge Murphy indicated that six different physicians had treated him or given him medical tests.
Judge Murphy was less than forthcoming in providing the commission with access to his medical files and his doctors. The commission was finally able to arrange for an independent medical examiner to examine Judge Murphy in the fall of 1999, resulting in a report dated November 23, 1999.
On January 14, 2000, the commission sent Judge Murphy another investigative letter requesting his response to allegations that he had failed to report for work on 15714 days in 1999.
*CJP Supp. 183 Judge Murphy responded by letter dated February 15, 2000, by counsel, Mr. Edward M. Moses, who complained that he had twice been denied extensions of time to respond to the investigation letter. Mr. Moses represented that he would be Judge Murphy’s attorney on an application for permanent disability. He alleged that Judge Muiphy had had a “syncopal episode” (a fainting spell) on September 21, 1999, at the courthouse and had been unable to return to work since then. The letter listed three physicians who were said to be of the opinion that Judge Murphy was permanently disabled. Mr. Moses never filed a disability application for Judge Murphy.
On March 3, 2000, the commission commenced formal proceedings against Judge Murphy by filing a notice of formal proceedings alleging that Judge Murphy’s extensive absences from court violated the California Code of Judicial Ethics. On April 20, 2000, Judge Murphy, then represented by different counsel, filed a verified answer admitting to some significant periods of absence but otherwise denying all allegations.
The commission also continued its investigation of Judge Murphy and, on March 31, 2000, sent Judge Murphy another investigation letter alleging incidents of lack of candor with the presiding judge and of failures to cooperate with judges and other court officials in the administration of court business. Judge Murphy responded by letter dated May 5, 2000.
On July 7, 2000, the commission sent another investigative letter to Judge Murphy—this time asking him to respond to allegations of teaching evening classes on days when he took sick leave, and testifying at depositions on days that he took sick leave. The letter also alleged that from July 1999 through December 1999, Judge Murphy, while absent on sick leave, took an intense regimen of college science courses that were prerequisites to applying to medical school and applied to medical school. It was further alleged that, on January 1, 2000, Judge Murphy left Los Angeles and traveled to the island of Dominica in the West Indies in order to attend medical school on the island.
Judge Murphy, now proceeding without counsel, twice requested extensions of time in which to respond to the July 7, 2000 investigative letter and never submitted a response. On September 11, 2000, a first amended notice of formal proceedings was filed that, in addition to the allegations of persistent failure or inability to perform judicial duties (count one), set forth specific allegations of failing to give judicial duties precedence over other activities (count two), five incidents of failure to cooperate in the administration of court business (count three), and a charge of malingering by falsely claiming to be medically disabled for the purpose of continuing to collect a judicial salary without perfonning judicial duties (count four). On October *CJP Supp. 184 16, 2000, Judge Murphy filed a verified answer claiming that he suffered a medical condition that rendered him “unable to perform his judicial functions at the relevant times.”
In the meantime, on April 21, 2000, in response to the commission’s request, the Supreme Court appointed three special masters to hear and take evidence in this matter and to report thereon to the commission.[1] A prehearing conference was held and the evidentiary hearing was scheduled for September 18, 2000, before the masters. Judge Murphy’s request for extensions of time and ultimate failure to respond to the July 7, 2000 investigation letter delayed the commission’s decision to issue a first amended notice of formal proceedings, and required the cancellation of the scheduled September 18, 2000 hearing.
The commission, while sensitive to providing Judge Murphy with due process, has been concerned that it could not proceed more expeditiously in this case. Although the California Constitution[2] and the commission’s rules[3] allow the commission to temporarily disqualify a judge, this requires a determination that continued service “is causing immediate, irreparable, and continuing public harm,” and the disqualification would be “without loss of salary.” (Rules of Com. on Jud. Performance, rule 120(b).) The commission had no choice but to marshal its evidence for presentation to a panel of special masters.
A second prehearing conference took place by telephone on Tuesday, October 3, 2000, between the masters, Mr. Jack Coyle of the office of trial counsel representing the commission, and Judge Murphy, representing himself. All agreed that the hearing could commence on January 22, 2001, and the commission issued an order noticing the hearing to be held at the Court of Appeal, Fourth Appellate District, Division Two in Riverside, California.
*CJP Supp. 185 The evidentiary hearing commenced on January 22, 2001, and concluded on January 25, 2001. The case in support of the charges was presented by Jack Coyle, Esq., with Valerie Marchant, Esq., and Sei Shimoguchi, Esq. Judge Murphy represented himself. The masters filed their 70-page report with the commission on April 5, 2001.
The parties were immediately sent copies of the masters’ report, informed that they could file objections to the report and informed that they could request an opportunity to be heard orally before the commission. Mr. Coyle submitted a timely brief and indicated that he did not request a hearing. Judge Murphy did not tender a brief or otherwise communicate with the commission. The parties were informed on April 26, 2001, that absent objection, the matter would be taken under submission by the commission on May 9, 2001.
FINDINGS OF FACT
Judge Murphy has been a registered nurse since 1977. He enrolled in law school in 1982, worked as a nurse throughout law school, and commenced private practice as a lawyer when he was admitted to the bar in 1984. After several years he became the administrator and corporate counsel of a medical group. He remained in this position until he was elected judge in June 1992.
From 1993 through early 2000, Judge Murphy was assigned to the Citrus Judicial District Municipal Court in West Covina. He presided over a portion of the misdemeanor trial calendar during these years until he was reassigned to a small claims/miscellaneous civil calendar in April 1999.
A. Absences (Count One)
In 1996, Judge Murphy had a subtotal thyroidectomy to remove a benign tumor and began taking Levoxyl to make up for the lost thyroid function. Judge Murphy was also regularly absent during his unsuccessful campaign for superior court judge. Judge Murphy was absent from the court for HYi days.
In 1997, Judge Murphy was the presiding judge. He missed a total of 66V2 work days. Judge Murphy attributed his 29 days of sick leave to colds and flu as well as a congenital nonfusion of his spine (spina bifada occulta), which allegedly caused debilitating back pain. Judge Murphy’s physician, Dr. Eshom, when called as a witness by Judge Murphy, testified that he did not think the condition “was causing [Judge Murphy] a problem.”
*CJP Supp. 186 In 1998, the court records show that Judge Murphy was absent for 96 days. Judge Murphy attributed much of his 28 days of sick leave to increasing backaches, neck aches and headaches resulting in insomnia. During the summer, Judge Murphy took over two and one-half months’ accumulated vacation time. A month was used for a trip to Ireland with his mother and the rest was spent convalescing.
In 1999, Judge Murphy was absent 159V2 days of which 157 days were listed on the court records as “sick” or “sick/personal” days. Judge Murphy was absent two and one-half days in January, six and one-half days in February, and all but one full day and four half days of March. He worked two and one-half days in April and did not return to the bench until July 1, 1999. The court records show no absences for Judge Murphy from then until a half day of vacation on September 16, 1999. Judge Murphy had a fainting spell at the court on September 20, 1999, and was taken to the hospital. He was absent from the court for the rest of the year.
In 2000, Judge Murphy was absent from court until April 3, 2000, when he commenced an assignment in the Los Angeles Metropolitan Court handling traffic matters, one of the least stressful assignments available to judges. Judge Murphy ceased working as of June 8, 2000, and has never returned to the court.
B. Activities That Interfered with the Proper Performance of Judicial Duties (Count Two)
1. From before 1996 through 1998, Judge Murphy taught or co-taught one or two classes a term on weekday evenings at Glendale University College of Law. The classes ran from 6:30 to 9:30 p.m. The masters found that on five days in 1996, on five days in 1997, and on two days in 1998 when Judge Murphy claimed he was too ill to work during the day, he taught or co-taught classes at night.
The masters also found that Judge Murphy taught a one- or two-hour session of the Baldwin Park Police Department’s Citizen’s Academy during the week of March 22, 1999, on a day that Judge Murphy was absent from work on sick leave.
2. In November 1998, a civil action was filed in a federal court alleging a scheme to hide approximately $1.7 million. Judge Murphy was named as a defendant in the action in April 1999. He was also named as a defendant in *CJP Supp. 187 a related adversary bankruptcy proceeding. Judge Murphy testified that the cases were subsequently dismissed against him.
The masters found that on five dates in 1999 when Judge Murphy was absent from work on sick leave, he attended and testified at his depositions in these lawsuits.
3. In July 1999, Judge Murphy began formal preparations for applying to Ross University School of Medicine located on the island of Dominica in the West Indies. His preparations included completing classes required for medical school.
He applied for admission to the Cleveland Chiropractic College in Los Angeles and sought and obtained permission to enroll late in Physics I. Judge Murphy completed Physics I and its corresponding lab by the end of August 1999. The class and lab were taught in two five-hour sessions, one on Saturday and one on Sunday, for a total of 10 class hours a week. Judge Murphy had perfect attendance and earned an A in the lecture and the lab while not missing a day in the courtroom.
On September 4, 1999, Judge Murphy enrolled in Physics II and Organic Chemistry I and their corresponding labs. These classes were from 8:00 a.m. to 6:30 p.m. on Saturday and Sunday, for a total of 20 hours of class a week. Although Judge Murphy had a fainting spell on Monday, September 20, 1999, for which he was hospitalized, Judge Murphy attended 20 hours of classes on Saturday, September 25, and Sunday, September 26. At the end of October, Judge Murphy completed the classes with perfect attendance. He earned a B in Physics II lab and an A in Physics II lecture, Organic Chemistry I lecture and Organic Chemistry I lab.
On October 27, 1999, Judge Murphy enrolled in General Chemistry II and Organic Chemistry II and their corresponding labs. One class was taught on Monday and Wednesday evenings in five-hour sessions (5:30-10:30 p.m.) and the other was taught in five-hour sessions on the weekends, for a total of 20 hours of class a week. Judge Murphy completed the classes in mid-December. He missed only one class and earned A’s in the classes and the labs.
In November 1999, Judge Murphy completed the College Level Examination Program in biology (known as the “CLEP” test). He earned a score in the 99th percentile. The CLEP test and the science classes at Cleveland Chiropractic were all prerequisites for Judge Murphy’s medical school application.
*CJP Supp. 188 On October 2, 1999, Judge Murphy filed an online application for Ross University. On the application he indicated that he did not have any disabilities that would interfere with the practice of medicine. On November 29, 1999, while on sick leave, Judge Murphy had a one-hour application interview at the Ross University office in Glendale, California. During the interview Judge Murphy was “very upbeat, very articulate, very responsive, very coherent” and his health appeared fine. When the interviewer asked the judge how his health was, he responded by referring only to his thyroid condition, and told the interviewer he had no health problems. Judge Murphy indicated that he was still interested in and active in scuba diving and skiing and stated that he decided to apply to medical school because “medicine was his first love, his first career desire.” He requested an expedited response because he “must notify Governor Gray Davis of his intent to resign his judgeship . . . .” Judge Murphy was accepted to medical school the next week for the term commencing on January 5, 2000.
On December 17, 1999, as part of his visa application, Judge Murphy obtained a letter .from the Los Angeles County Sheriff’s Department to the Chief of Immigration in Dominica attesting to his lack of criminal record and good character. The letter stated, “Judge Muiphy will be traveling to Dominica on a vacation.”
On December 21, 1999, Judge Murphy obtained a certificate of good health from Dr. Boutros as part of his visa application. He did not obtain the certificate from Dr. Eshom, his treating physician, because he knew Dr. Eshom would not certify that he was in good health. The certificate listed Judge Murphy’s thyroid condition as his only medical condition and listed Synthroid as the only medication that Judge Murphy was taking.
On December 27, 1999, Judge Murphy purchased a round trip ticket to Dominica with a departure date of January 1, 2000, and a return date of April 22, 2000 (the last day of classes at Ross University for the spring semester).
On December 30, 1999, Judge Murphy faxed a disability slip signed by Dr. Eshom and dated “12/31” from his house to the court, as he had done on a number of occasions. The slip said, “Continues to be disabled. Unable to work until further evaluation.” Judge Treu considered the slip unacceptable because no specific end date had been given. He was unaware that Judge Murphy was about to leave the country.
4. On January 1, 2000, Judge Murphy left for Dominica. He did not resign his judgeship and he did not inform Judge Treu, or any other judge or court employee that he was leaving the country and planned to study medicine. In *CJP Supp. 189 Dominica, Judge Murphy registered for classes on January 5. Classes began on January 5, and Judge Murphy picked up his picture ID card on January 9.
Judge Murphy returned home on January 14, 2000. Judge Murphy denied knowing of any adverse publicity about his attending medical school in the Caribbean prior to returning home.
C. Incidents of Lack of Candor and Failure to Cooperate in the Administration of Court Business
1. In January 1999, Judge Ralph Michael Treu became the presiding judge of the Citrus Judicial District Municipal Court. Due to Judge Murphy’s extended absences for sick leave, Judge Treu kept a log from January 7 to April 27, 1999. Judge Murphy called in sick on January 20, and was not in on January 21. At a meeting with Judge Treu on January 22, Judge Murphy told him that “he may need to take significant time off in the future as directed by his physician.” He further stated that he currently had no immune system left, that his thyroid condition of 1995 and 1996 resulted in the removal of a malignant tumor and that his current condition was serious. Judge Treu suggested that Judge Murphy take a less demanding assignment doing a civil overflow/small claims calendar, but Judge Murphy declined the proposal.
Judge Murphy denied characterizing the tumor as malignant. He suggested that he may have indicated that prior to the surgery there was concern that the growth to be removed was malignant, but he maintains he did not tell Judge Treu that the growth that was removed actually was malignant. Judge Murphy noted that he is a nurse and “quite facile with employing medical terms” and he claimed that Judge Treu “misconstrued” what he said because Judge Treu lacked medical training.
The masters concluded that Judge Murphy lied about his condition to induce Judge Treu to grant him additional sick leave, and the commission adopts the masters’ finding. The masters noted that Judge Treu testified that prior to taking the bench he had 20 years in private practice focused on plaintiff’s tort litigation and medical malpractice. The masters found that Judge Treu had sufficient medical knowledge to understand the difference between a preoperative tentative diagnosis of cancer and a postoperative finding of malignancy. The masters also noted that Judge Treu summarized his conversations with Judge Murphy in a log within 24 hours and that when he testified, Judge Treu was absolutely confident that Judge Murphy told him the tumor was malignant. Finally, the masters contrasted Judge Treu’s “clear, *CJP Supp. 190 compelling, and credible testimony on this and other issues,” with their finding that Judge Murphy’s testimony “generally lacked credibility.”
2. On March 4, 1999, four judges complained to Judge Treu that Judge Murphy’s frequent absences required them to cover his misdemeanor calendar. Judge Murphy was again absent on Monday, March 8, but worked on March 9, when he attended a judge’s meeting. Judge Treu described the meeting as “acrimonious.” Judge Murphy acknowledged that this characterization was correct and attributed his actions to the “frazzled” emotional state he was in as a result of his medical condition. Judge Murphy did not return to work after the March 9, 1999, judges’ meeting. He next returned to the court on Friday, March 26, 1999, for another judges’ meeting.
On March 26, 1999, Judge Murphy told Judge Treu that he would not be at work the following week because he was undergoing medical tests. Judge Murphy claimed sick leave for the week of March 29, but did not undergo any medical tests. Instead, on Tuesday, March 30, 1999, Judge Murphy appeared and testified at his deposition in the civil action.
When first questioned by the commission about his representation to Judge Treu, Judge Murphy admitted telling Judge Treu that he was having tests and asserted that he could identify what tests occurred if he had his complete medical records. In his verified answer, however, Judge Murphy admitted that he did not undergo any medical tests the week of March 29, 1999, and labeled his conversation with Judge Treu a misunderstanding. He claimed that he told Judge Treu only that he anticipated undergoing medical tests and asserted that since he had an HMO, the tests were performed at a later date. Judge Murphy further stated in his verified answer that Judge Treu “was in the possession of a medical certificate of disability dated March 9, 1999 and signed by Dr. Eshom,” and that he did not mention the deposition because he was not thinking about it.
The masters found that Judge Murphy did tell Judge Treu that he would be absent the week of March 29, 1999, for medical tests when he would actually be testifying at his deposition on March 30, 1999, and that the purpose of the lie was to falsely claim sick leave instead of taking personal leave. The commission adopts these findings of the masters. The masters cite Judge Murphy’s shifting explanations and note that again Judge Murphy’s testimony generally lacked credibility. They also point out that while a doctor’s note dated March 9, 1999, for a two-month medical absence does exist in Dr. Eshom’s file, “Judge Murphy provided no such note to Judge Treu; Judge *CJP Supp. 191 Treu did not have such a note, and Judge Murphy did not mention it during their conversation.”
3. Judge Murphy was released from the hospital on September 22, 1999, following his fainting spell on September 20. Shortly thereafter, Judge Treu received a short note on one of Dr. Eshom’s preprinted prescription pads saying, “No work x 2wks.” The masters found that such disability “slips” or “certificates” or doctor’s notes, “usually did not come directly from the doctor’s office, but were faxed from Judge Murphy’s home after normal business hours.” Judge Treu received a second disability slip covering the two weeks from October 7 through October 24, a Sunday.
On Thursday, October 21, 1999, Judge Murphy left a message with the judicial secretary saying his doctor had him off for another couple of weeks. No disability slip accompanied the telephone message. The next day, Judge Treu wrote a letter to Judge Murphy acknowledging the communication and requesting a doctor’s disability certificate. Although Judge Treu requested a doctor’s certificate for the period of time from October 25 through November 16, 1999, in three additional letters, he never received any documentation. Judge Murphy, however, did provide disability slips from Dr. Eshom for the rest of his absences through the end of the year.
The masters note that when first questioned by the commission on this matter, Judge Murphy stated that he did not recall seeing the letters from Judge Treu and speculated that the letters may have been intercepted, destroyed or hidden because he had been living in marital discord. Judge Murphy further indicated that if he had seen the letters he may have told Dr. Eshom to send a note directly to Judge Treu. In his verified answer, Judge Murphy asserted that his phone calls were sufficient because there was no requirement that he provide any doctor’s note.
The masters found that Judge Treu’s request for medical documentation was justified and that Judge Murphy did not provide any documentation supporting his absences from October 25 through November 16, 1999. The commission adopts the masters’ findings.
4. As noted, when Judge Murphy left the country on January 1, 2000, to attend medical school in Dominica, he did not resign his judgeship and he did not inform Judge Treu or any other judge or court employee that he was leaving the country or that he was planning to study medicine or how to contact him.
Judge Murphy contended that he was not obligated to provide the court with this information because he was on sick leave. The masters found that *CJP Supp. 192 Judge Murphy was obligated to keep the court informed of his whereabouts and that he failed to do so. The commission adopts these findings by the masters. The masters note that Judge Chavez testified that the policy of the Los Angeles County Superior Court was to require judges away from the court to keep the court apprised of their locations and a means to communicate with them. The commission also notes that Judge Murphy testified that he occasionally undertook some judicial functions such as signing warrants while on sick leave.
Judge Murphy also testified that when he left for Dominica he was convinced that he was permanently disabled and that he thought that once his disability application was filed he would no longer be a sitting judge. To the extent that Judge Murphy proffers this as an excuse for his failure to keep the court informed of his whereabouts, his argument is rejected. The masters found that Judge Murphy’s “claim that he believed his lawyer would apply for his disability leave is not credible in light of his training and sophistication and in light of the fact that he knew he had signed no such documents.” Judge Murphy could not reasonably believe that he was no longer a judge when he left the country for Dominica.
5. On January 3, 2000, the judicial secretary faxed a ballot regarding court unification to Judge Murphy’s home. On January 5, 2000, the secretary telephoned Judge Murphy’s home and left a message to remind Judge Murphy that he had probable cause duty on Saturday, January 8, 2000. She noted that he could perform this duty at the West Covina Police Department or from his home. On January 7, the secretary left another message asking about the ballot and reminding Judge Murphy to respond as soon as possible about probable cause duty. Judge Murphy was in the West Indies and never returned the phone calls or the ballot. Another judge was assigned to perform Judge Murphy’s probable cause duties.
The masters rejected Judge Murphy’s argument that he was not obliged to respond because he was sick, and the commission concurs. As noted, Judge Murphy testified that he on occasion performed judicial duties even when on sick leave.
D. Malingering
1. Affirmative evidence that Judge Murphy was not ill.
The masters found that Judge Murphy was not ill in the sense that he was unable to perform his judicial duties. They note seven factors to support their finding that Judge Murphy could have performed his duties most of the time *CJP Supp. 193 if not all of the days that he called in sick, especially during the long absences in 1999 and 2000.
a. When Judge Murphy did go to work there were no observable signs of illness. Judge Murphy’s colleagues at the municipal court uniformly testified that Judge Murphy appeared to be healthy, energetic and positive when at work. There were no indications that he was struggling with any medical conditions. One judge did qualify his testimony by noting that there were times when Judge Murphy appeared to be suffering from normal illnesses such as a cold or the flu, but he continued that otherwise Judge Murphy “is probably the most upbeat and happy-go-lucky type of person I’ve ever met.”
b. There were a number of instances when Judge Murphy was seen out in the community when he was absent from work on sick leave. The reports of these “Murphy sightings” consistently included that Judge Murphy appeared to be healthy.
c. In 1996 and 1997 during the evenings on ten days he was on sick leave, Judge Murphy taught three-hour law school classes. In 1998 he twice taught during the evenings of days he was on sick leave.
d. The masters note that Judge Murphy started taking pre-med classes for medical school in July 1999, after returning to work following his nearly four months of absences. They also note that he returned to work only after being informed that the commission was investigating his absences. After taking 10 hours of classes in July and August, Judge Murphy took 20 hours of classes a week from September through the middle of December, 1999, earning all A’s except for one B. He had perfect attendance, except for one absence. He even attended 20 hours of classes on the weekend of September 26, 1999, following his fainting spell on Monday, September 20.
e. On five days in 1999 when he claimed he was ill, Judge Murphy testified at his depositions. The masters note that excluding lunch recesses, these depositions involved three to six and a half hours of deposition time.
f. On November 18, 1999, Judge Murphy took the CLEP test in biology and scored in the top 1 percent. The masters note that Dr. Eshom testified that Judge Murphy’s score showed that “he’s cognitively able to decipher information.”
g. Finally, the masters found that his performance during the hearing before them clearly demonstrated his capacity to serve as a judge. The masters explained: “During the entire four days of hearing, Judge Murphy performed as an experienced and skilled courtroom attorney. He generally showed no *CJP Supp. 194 weakness, lack of attention, slowness, or misunderstanding. He competently objected to evidence and argued his objections. He conducted cross-examination in discrete segments aimed at making specific points. After the first morning session on the second day, Judge Murphy requested a recess until the next day because he was ‘really feeling ill’ and did not think that he could continue. His request was denied. Although occasionally thereafter he complained of having a headache, his competent performance and professional demeanor continued unabated.”
2. Judge Murphy’s evidence that he was ill.
The masters found that Judge Murphy’s evidence was less than persuasive. Judge Murphy reported having chronic, severe headaches, neck aches and backaches (partially attributable to a congenital nonfusion of a lumbar vertebra and degenerative disc disease) that prevented him from sleeping more than a couple of hours a night. Judge Murphy represented that he also suffers from chronic fatigue syndrome (CFS) and that this and other illnesses render him physically incapable of serving on the bench. He thought that the genesis of these symptoms was the thyroidectomy. Judge Murphy also claimed that he had a phobic reaction to judicial duties that aggravated his symptoms. He testified that he became frazzled because of these symptoms resulting in his “going off’ on his colleagues, such as he did in March 1999 to Judge Treu. Judge Murphy said that he could perform other activities that he perceived as less stressful, including his various extrajudicial activities.
The masters note that part of the weakness of Judge Murphy’s “phobia” claim is its evidentiary failings. Only Judge Murphy and Dr. Eshom testified about Judge Murphy’s physical and mental condition. Judge Murphy made repeated references to diagnoses and other statements by Dr. McCord, who apparently was his psychiatrist. Judge Murphy, however, chose not to call Dr. McCord and made no representation that he was unable to do so. Furthermore, statements attributed to Dr. McCord and other doctors’ hearsay statements were admitted by the masters only for the limited purposes of showing how they affected Dr. Eshom’s diagnoses or opinions and of explaining Judge Murphy’s subsequent conduct and state of mind.
In his April 23, 1999 letter to Judge Treu, Dr. Eshom represented that Judge Murphy suffered from chronic cephalgia (headache), fibromyalgia (body ache) and fatigue syndrome. At the hearing, under questioning from Judge Murphy, Dr. Eshom acknowledged that there was “no real scientific test that we can order for these diagnoses” and that they were formulated based on symptoms Judge Murphy presented when he came to his office. The April 1999 letter makes no mention of any difficulties stemming from spina bifida or of any judicial phobia.
*CJP Supp. 195 Although Dr. Eshom in his testimony indicated that he would support Dr. McCord’s purported “diagnoses of phobia, panic disorders, anxiety reaction specifically to the court,” he did not explain why he would support such a diagnosis. The record concerning the judicial phobia is devoid of any test results allegedly conducted by Dr. McCord or any other supporting documentation. No competent evidence was presented as to the basis for Dr. McCord’s alleged conclusions or even of Dr. McCord’s background, experience or competence.
Despite Dr. Eshom’s belief that Judge Murphy was disabled, some of his testimony indicated that Judge Murphy was not disabled. Dr. Eshom testified that Judge Murphy had not “lost his ability to analyze anything” and that his high score on the CLEP test for biology shows that “he’s cognitively able to decipher information.” Dr. Eshom acknowledged that there was no difference regarding “physical ability or disability” between “sitting on the judicial bench for five hours or sitting in a classroom for five hours.”
Although Judge Murphy claimed that a congenital anomaly in his back caused him pain and cost him sleep, no documentation was presented to support this contention. Dr. Eshom did not mention this condition in his April 23, 1999 letter. At the hearing, Dr. Eshom testified that he was aware of the condition because Judge Murphy had told him about it, but that he did not independently examine Judge Murphy because he didn’t think that it was causing Judge Murphy a problem.
Judge Murphy and Dr. Eshom testified about Judge Murphy’s elevated levels of Epstein-Barr virus. The tests purportedly showing these elevated levels were not admitted into evidence, so this is unsupported hearsay.[4] In fact, no documentary evidence of Judge Murphy’s medical condition was offered or admitted, except Dr. Eshom’s April 23, 1999 letter, various disability slips, and Dr. Boutros’s health certificate. Accordingly, Judge Murphy’s insistence that the Epstein-Barr virus was the “causative agent” of CFS remains an unsupported self-serving assertion.
At the hearing, Judge Murphy elicited from Dr. Eshom an opinion that he did not believe Judge Murphy was malingering. In support of that belief, Judge Murphy cited Dr. Eshom’s board certification and experience in emergency room medicine. The masters rejected this perspective noting that “Dr. Eshom’s experience with emergency room malingerers in no way *CJP Supp. 196 prepared him for dealing with a malingerer with Judge Murphy’s degree of medical sophistication” and that there was no “testimony that the emergency room malingerers were fating fibromyalgia.”
The masters further noted that Dr. Eshom’s opinions were shown to be suspect because of information Judge Murphy withheld about his nonjudicial activities. Judge Murphy told Dr. Eshom that he was talcing some chemistry and physics classes, but he did not say he was talcing five-hour classes two nights a week and another five hours each Saturday and Sunday. When Dr. Eshom wrote a disability slip for Judge Murphy following his fainting episode on September 20, Judge Murphy did not inform him that he intended to take 20 hours of classes on the weekend. Although Dr. Eshom refused to acknowledge that this information affected the validity of his diagnoses and disability slips, he did testify that knowledge of these facts would have been “helpful.” He also admitted that Judge Murphy, as a registered nurse, should have known this and that Judge Murphy’s attendance of 20 hours of classes during the weekends did not sound as if he were disabled.
Dr. Eshom tried to leave open the possibility that Judge Murphy’s thyroidectomy might support the existence of his symptoms. In cross-examination, however, he conceded that he monitored Judge Murphy’s thyroid condition to keep it “in balance” and “close to normal.”
In addition, the evidence concerning Judge Murphy’s efforts to obtain a disability retirement undermine his claim of being disabled. Judge Murphy testified that he had intended to resign from the bench in the fall of 1999, but that an attorney acquaintance, Mr. Moses, convinced him that he qualified for a disability retirement. He testified that he did not investigate this matter but relied entirely on the attorney. He testified that when he left the country to go to medical school on January 1, 2000, he believed that his attorney had filed a disability application. The masters, however, found that his belief was not credible. Judge Murphy further testified that when he returned from Dominica he attempted to get the necessary papers from Dr. Eshom to complete the application, but was unsuccessful. There is no explanation as to why a doctor who first stated that Judge Murphy was disabled in April 1999, and was the only witness called by Judge Murphy in the hearing in January 2001, would not issue a report in January 2000. In any event, Judge Murphy testified that he did not actually apply for disability retirement until July 2000, that he received the commission’s tentative denial of the application on November 16, 2000, and took no further action on the application.[5] Judge Murphy’s initial reliance on his attorney, his failure to actually apply for disability *CJP Supp. 197 retirement until My 2000 and his acceptance of a tentative denial hardly constiMe a robust presentation of his claim.
3. Judge Murphy’s lack of credibility.
The masters listed several specific reasons for finding that Judge Murphy’s testimony lacked credibility.
a. The masters first point to the two false answers contained in Judge Murphy’s medical certificate for Ross University. On December 21, 1999, Judge Murphy went to Dr. Boutros’s office without an appointment and presented him with the health certificate from Ross University. Dr. Boutros filled it out and returned it to Judge Murphy that day. The completed certificate contained two misrepresentations: (1) the only “present medication” listed was Synthroid; and (2) only hypothyroidism was listed in response to the question “condition(s) for which you are being treated.”
Judge Murphy testified that he did not go to Dr. Eshom because he knew that Dr. Eshom did not think that he was fit to go to medical school. He also did not go to Dr. McCord, who he claimed to have been seeing regularly for psychiatric treatment.
Judge Murphy had both a personal and medical relationship with Dr. Boutros. Sometime before 1996, Judge Murphy conducted Dr. Boutros’s wedding in Dr. Eshom’s house. Dr. Eshom and Dr. Boutros became partners, but in 1996, they ended their partnership because Dr. Eshom believed that Dr. Boutros was “very sloppy” and his character left “a lot to be desired.” Dr. Eshom never shared his evaluation of Dr. Boutros with Judge Murphy, but Judge Murphy agreed that Dr. Boutros was sloppy.
Dr. Boutros was one of the physicians involved in the diagnosis and treatment of Judge Murphy’s thyroid tumor in 1996. After 1996, however, Judge Murphy only saw Dr. Boutros every three or four months for such problems as upper respiratory tract infections and colds. Judge Murphy’s medical appointments with Dr. Boutros were only a “minute or two” in duration and perfunctory. On these occasions Dr. Boutros did not ask, and Judge Murphy did not say, what medications he was taking.
Judge Murphy denied responsibility for the falsehoods in the certificate. He claimed he did not know what the certificate said and that Dr. Boutros completed the form. He testified that he didn’t keep anything from Dr. Boutros, but Dr. Boutros didn’t ask many questions. Judge Murphy also testified that he knew that Dr. Boutros had only limited knowledge of his medical conditions.
*CJP Supp. 198 The masters found that Judge Murphy knew that if “he did not inform himself about the certificate and directly provide full information to Dr. Boutros, the certificate would inaccurately represent his medical condition and the medications he was taking.” They reported that Judge Murphy very much wanted to go to medical school and that he believed that the university might not accept him if they were fully informed of his medical condition and medications. The masters note that Judge Murphy’s “apparent indifference to the certificate and Dr. Boutros’s answers alone justif[y] an inference of his indifference to truth when it is in his perceived interest,” and they continue: “We also go further and find Judge Murphy was responsible for the falsehoods on the certificate to the same extent as if he had himself personally read the certificate and written the false answers. Judge Murphy selected Dr. Boutros precisely because Judge Murphy knew Dr. Boutros would answer the questions falsely. Since Judge Murphy obtained false answers on his certificate, we infer that Judge Murphy’s testimony generally lacks credibility.”
b. The masters next cite Judge Murphy’s contradictory statements to Judge Treu and to Ross University. In January 1999, Judge Murphy told Judge Treu that “he has currently virtually no immune system left, that his thyroid condition of 1995 and 1996 resulted in the removal of a malignant tumor, and that his current condition is serious.” The seriousness of Judge Murphy’s condition (without the characterization of the tumor as malignant) was reiterated by Judge Murphy’s having Dr. Eshom write a letter to Judge Treu on April 23, 1999, stating that Judge Murphy should be considered disabled because in addition to hypothyroidism, he had chronic cephalgia, syncope secondary to chronic cephalgia, chronic fibromyalgia and CFS.
In contrast, at his application interview in November 1999, Judge Murphy represented to the interviewer that he had no health problems other than that he had had thyroid surgery earlier in life and took Synthroid to stimulate his thyroid. Judge Murphy also indicated that scuba diving and skiing were “things he was interested in and was still active in.”
c. Third, the masters cite a couple of particular inconsistencies in Judge Murphy’s testimony. Judge Murphy claimed that despite his judicial phobia he could perform well as a law professor and as a student of demanding subjects because they were enjoyable. The masters note that Judge Murphy also testified that he loved being a judge. Judge Murphy testified that he could not return to the bench because he could not get a doctor to release him. The record shows, however, that in July 1999, after the commission began its investigation, and in April 2000, following the filing of the notice of formal proceedings, Judge Murphy returned to the bench without any doctor’s “release.” The masters conclude: “While Judge Murphy appeared to *CJP Supp. 199 have some kind of excuse for virtually every eventuality, their variety and facility ultimately undermine his credibility. His responses fail under the weight of their own inconsistency and strained ingenuity.”
The commission agrees with the masters and adopts their findings that Judge Murphy was not ill in the sense that he was medically unable to perform his judicial duties.
CONCLUSIONS OF LAW
In this section the commission considers whether Judge Murphy’s actions violate sections of the California Code of Judicial Ethics and whether they constitute actions for which discipline may be imposed under article VI, section 18, subdivision (d) of the California Constitution. This section of the Constitution provides that the commission may “censure a judge or former judge or remove a judge for action occurring not more than 6 years prior to the commencement of the judge’s current term or of the former judge’s last term that constitutes willful misconduct in office, persistent failure or inability to perform the judge’s duties, habitual intemperance in the use of intoxicants or drugs, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute
The Supreme Court in Broadman v. Commission on Judicial Performance (1998) 18 Cal.4th 1079, 1091 [77 Cal.Rptr.2d 408, 959 P.2d 715] reiterated that to commit willful misconduct in office, “a judge must (1) engage in conduct that is unjudicial and (2) committed in bad faith, (3) while acting in a judicial capacity.” The court went on to explain that a judge “acts in bad faith only by (1) performing a judicial act for a corrupt purpose (which is any purpose other than the faithful discharge of judicial duties), or (2) performing a judicial act with knowledge that the act is beyond the judge’s lawful judicial power, or (3) performing a judicial act that exceeds the judge’s lawful power with a conscious disregard for the limits of the judge’s authority.” (18 Cal.4th at p. 1092.)
The Supreme Court then defined prejudicial conduct: “Prejudicial conduct is distinguishable from willful misconduct in that a judge’s acts may constitute prejudicial conduct even if not committed in a judicial capacity, or, if committed in a judicial capacity, not committed in bad faith. Prejudicial conduct is 'either “conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office” [citation] or “willful misconduct out of office, i.e., unjudicial conduct committed in bad faith by a judge not then acting in a judicial capacity” [citation].’ (Doan v. Commission on Judicial Performance [(1995)] 11 Cal.4th *CJP Supp. 200 294,[] 312 [45 Cal.Rptr.2d 254, 902 P.2d 272], original italics.)” (Broadman v. Commission on Judicial Performance, supra, 18 Cal.4th at pp. 1092-1093.)
Judge Murphy’s extensive absences as charged in count one clearly constitute a persistent failure or inability to perform judicial duties, especially since the beginning of 1999. Judge Murphy concedes the extensive absences, but claims he is disabled. The masters, however, concluded, and the commission agrees, that Judge Murphy was not and is not disabled, and that he “has persistently failed to perform his duties as a judge when capable of doing so.”
As alleged in count two, Judge Murphy considered his nonjudicial activities more important than his judicial duties and allowed them to interfere with his judicial duties. In doing so Judge Murphy specifically violated California Code of Judicial Ethics canons 3A and 4A(3) as well as the more general canons 1 and 2A.[6] The violations of the California Code of Judicial Ethics constitute incidents of conduct prejudicial to the administration of justice that brings the judicial office into disrepute. They are not incidents of willful misconduct because Judge Murphy was not acting in a judicial capacity when he engaged in these activities.
The five incidents of Judge Murphy’s failure to cooperate with his presiding judge in the administration of court business alleged in count three violate California Code of Judicial Ethics canon 3C(1) and generally violate canons 1 and 2.[7] Judge Murphy’s statement to the presiding judge that the benign thyroid tumor had been malignant constituted willful misconduct because lying to his presiding judge is a violation of the judicial canons, he was acting in his judicial capacity in discussing his assignments with the presiding judge, and his lie was in bad faith for the purpose of falsely obtaining sick leave. Similarly, Judge Murphy’s misrepresentation that he would be absent for medical tests the week of March 29, 1999, constituted willful misconduct because he violated the judicial canons, he was acting in his judicial capacity, and his purpose was to falsely obtain sick leave.
Judge Murphy’s failure to provide a doctor’s note for his sick leave absences from October 25, 1999, through November 16, 1999, constitutes *CJP Supp. 201 conduct prejudicial to the administration of justice that brings the judicial office into disrepute. The masters found, and the commission agrees, that the presiding judge’s request for a doctor’s note was reasonable, and that in failing to provide a doctor’s note Judge Murphy violated judicial canons. Furthermore, the failure was in bad faith as it furthered his scheme—as found by the masters—to falsely obtain sick leave.
Judge Murphy’s departure from the country and concomitant failure to keep the court informed of his whereabouts, and his failure to respond to the judicial secretary’s inquiry concerning probable cause duty also constitute incidents of conduct prejudicial to the administration of justice that brings the judicial office into disrepute. The masters found, and the commission agrees that Judge Murphy’s leaving the country to attend medical school without informing anyone of his plans, location or means to communicate with him violated judicial canons. Judge Murphy’s failure to respond to the judicial secretary’s inquiries as to where he would perform his probable cause duty clearly violates California Code of Judicial Ethics canons 3A, 3C(1) and 4. Even if Judge Murphy did not know of the judicial secretary’s inquiries, his inaction was in bad faith because by leaving the country and not informing anyone of his whereabouts he prevented the judicial secretary from contacting him.
As Judge Murphy did not suffer from any illness disabling him from performing his judicial duties during his extensive absences in 1999 and 2000, his falsely obtaining sick leave constitutes malingering as alleged in count four. This conduct violates California Code of Judicial Ethics canons 1, 2A, 3A, C(l) and 4A(3) and constitutes willful misconduct. Judge Murphy was acting in his judicial capacity in his fraudulent use of sick leave. The masters concluded, and the commission agrees, that Judge Murphy was motivated by a bad faith intent of remaining on the payroll of the State of California as a full-time, sitting judge while avoiding his judicial obligations.
DISCIPLINE
The commission is guided by the Supreme Court’s reiteration that the purpose of a judicial disciplinary proceeding is not punishment, “ ‘but rather the protection of the public, the enforcement of rigorous standards of judicial conduct, and the maintenance of public confidence in the integrity and independence of the judicial system.’ ”[8] The commission finds that these purposes require the removal of Judge Murphy from the bench.
*CJP Supp. 202 The Supreme Court has observed that determining whether to remove a judge from office, like choosing any other sanction, is an art, not a science.[9] Nonetheless, the commission finds that the court’s opinions indicate that the severity of the misconduct, the duration of the misconduct and evidence of contrition and willingness to reform are relevant to a determination of what discipline to impose.[10] It should be noted, however, that removal may be appropriate even where these factors do not all weigh against the judge.[11]
Judge Murphy, in claiming sick leave when he was not disabled and lying to his presiding judge, engaged in willful misconduct that displays moral turpitude and dishonesty. The public will not, and should not, respect a judicial officer who has been shown to have repeatedly lied for his own benefit. The Supreme Court in Kloepfer v. Commission on Judicial Performance (1989) 49 Cal.3d 826, 865 [264 Cal.Rptr. 100, 782 P.2d 239] noted that honesty is a minimum qualification that is expected of every judge. The severity of Judge Murphy’s willful misconduct might well in itself require his removal from the bench.
Judge Murphy’s misconduct also continued over several years. His cavalier attitude to sick leave manifested itself as early as 1996 when he would teach law school in the evenings on days that he purported to be too ill to sit as a judge. In the spring of 1999, he demonstrated a complete disregard for his judicial duties as well as the impact his absences had on his colleagues and the court. In the fall of 1999, he felt justified in taking intense college level science classes in preparation for medical school while on sick leave. Even after he dropped out of medical school, he did not return to the bench for three months and did not file an application for a disability retirement until July 2000. Thus, the evidence shows that over several years Judge Murphy persisted in a reprehensible course of conduct.
*CJP Supp. 203 The record contains little evidence of contrition or willingness to reform. While Judge Murphy admitted that his actions were prejudicial to the administration of justice, he continued to insist on his subjective good faith based on his disabilities. Other than his insistence that he is disabled, Judge Murphy offered no evidence in mitigation. The masters, however, found that Judge Murphy was not disabled and that he had proceeded in bad faith and the commission adopts those findings. Judge Murphy has not filed any objections to the masters’ report with the commission. Accordingly, there is nothing before the commission that shows contrition or willingness to reform.
Finally, it should be noted that Judge Murphy was also charged with the persistent failure or inability to perform his judicial duties. The masters found that these charges had been proved and the commission adopts those findings. Judge Murphy testified that his application for a disability retirement had been denied, and he has not indicated that he has any intention of returning to the bench or of renewing his disability application. Accordingly, even if there were not overwhelming evidence of malingering and other willful misconduct as alleged in counts three and four, and of conduct prejudicial to the administration of justice as alleged in count two, the commission would be compelled to remove Judge Murphy from the bench.
CONCLUSION
The commission orders that Judge Patrick B. Murphy of the Los Angeles County Unified Superior Court be hereby removed from the bench for: (1) malingering by falsely claiming to be ill as charged in count four; (2) willful misconduct and prejudicial misconduct in failing to cooperate in the administration of court business as charged in count three; (3) conduct prejudicial to the administration of justice that brings the judicial office into disrepute in giving nonjudicial activities precedence over, and allowing them to interfere with, his judicial duties as charged in count two; and (4) persistent failure to perform his judicial duties as charged in count one. The special masters found that the charges were sustained by clear and convincing evidence and the commission adopts the masters’ findings of fact and conclusions of law. The commission concludes that its responsibilities to protect the public, enforce rigorous standards of judicial conduct and maintain public confidence in the integrity of the judiciary dictate that Judge Murphy be removed from office.
*CJP Supp. 204 This decision shall constitute the order of removal of Judge Patrick B. Murphy.
Commission members Mr. Michael A. Kahn, Judge Rise Jones Pichon, Ms. Lara Bergthold, Judge Madeline I. Flier, Mr. Marshall B. Grossman, Ms. Gayle Gutierrez, Mrs. Crystal Lui, and Justice Vance W. Raye, voted in favor of all the findings and conclusions expressed herein and in the removal of Judge Patrick B. Murphy from judicial office. Commission members Mr. Mike Farrell and Ms. Ramona Ripston did not participate in this proceeding. There is currently one public member vacancy.

 On October 20, 2000, the Supreme Court issued an order noting that one of the initial special masters had withdrawn from the proceedings and appointed another justice to replace him. The special masters who heard the evidence and issued the report are Justice Art W. McKinster, Court of Appeal, Fourth Appellate District, Division Two (presiding special master); Justice Carol A. Corrigan, Court of Appeal, First Appellate District, Division Three; and Justice Betty Ann Richli, Court of Appeal, Fourth Appellate District, Division Two.

 Article VI, section 18, subdivision (b) of the California Constitution reads: “The Commission on Judicial Performance may disqualify a judge from acting as a judge, without loss of salary, upon notice of formal proceedings by the commission charging the judge with judicial misconduct or disability.”

 Rule 120(b) of the Rules of the Commission on Judicial Performance reads, in part: “Before the commission has reached a determination regarding removal or retirement of a judge, the commission may temporarily disqualify a judge without loss of salary upon notice of formal proceedings pursuant to article VI, section 18(b) of the California Constitution if the commission determines that the continued service of the judge is causing immediate, irreparable, and continuing public harm.”

 The masters note that although Dr. Eshom testified that moderately high levels of Epstein-Barr virus indicated a chronic debilitating infection, he also indicated that he was not an expert in that field but had read in the literature that there’s a correlation of people who have CFS also having elevated Epstein-Barr virus titers. He also recognized that no mechanism had been discovered as to how the virus caused the symptoms.

 Policy Declarations of the Commission on Judicial Performance, policy 5.4(6) provides that a tentative denial becomes final 30 days after issuance unless, within 30 days of the tentative denial, the judge files a request to present additional evidence.

 Canon 1 of the California Code of Judicial Ethics states, “a judge shall uphold the integrity and independence of the judiciary” (capitalization omitted), and canon 2A states, “A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.” Canon 3A states, “[a]ll of the judicial duties prescribed by law shall take precedence over all other activities of every judge.” Canon 4A(3) provides that a judge shall conduct all extrajudicial activities so that they do not “interfere with the proper performance of judicial duties.”

 Canon 3C(1) of the California Code of Judicial Ethics states, “[a] judge shall diligently discharge the judge’s administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration, and shall cooperate with other judges and court officials in the administration of court business.”

 Broadman v. Commission on Judicial Performance, supra, 18 Cal.4th at page 1112, quoting Adams v. Commission on Judicial Performance (1995) 10 Cal.4th 866, 912 [42 Cal.Rptr.2d 606, 897 P.2d 544],

 See Broadman v. Commission on Judicial Performance, supra, 18 Cal.4th at page 1112.

 See, for example, Doan v. Commission on Judicial Performance, supra, 11 Cal.4th at page 339 in wliich the Supreme Court removed a judge for willful and prejudicial misconduct that displayed moral turpitude, dishonesty and corruption. In Fletcher v. Commission on Judicial Performance (1998) 19 Cal.4th 865, 918 [81 Cal.Rptr.2d 58, 968 P.2d 958], the Supreme Court noted that the number of wrongful acts is relevant to determining whether they were isolated occurrences or part of an improper course of conduct. In Gonzalez v. Commission on Judicial Performance (1983) 33 Cal.3d 359 [188 Cal.Rptr. 880, 657 P.2d 372], the court noted that the record belied the judge’s claim that he learned from past experience. In contrast, in Doan, the court indicated that it would hesitate to remove a judge who demonstrated readiness, willingness and ability to reform under a less severe sanction.

 In Geiler v. Commission on Judicial Qualifications (1973) 10 Cal.3d 270, 284, footnote 11 [110 Cal.Rptr. 201, 515 P.2d 1], the Supreme Court while explaining that “ ‘conduct prejudicial to the administration of justice’ ’’ was a less severe charge than “wilful misconduct,” noted “[fit should be emphasized that our characterization of one ground for imposing discipline as more or less serious than the other does not imply that in a given case we would regard the ultimate sanction of removal as unjustified solely for ‘conduct prejudicial to the administration of justice which brings the judicial office into disrepute.’ ”