Corrected reprint 06/26/09

**FOR PUBLICATION**

# JUDICIAL COUNCIL
# OF THE NINTH CIRCUIT

In Re Complaint
of Judicial Misconduct

No. 08-90113

ORDER

Filed June 24, 2009

## ORDER

KOZINSKI, Chief Judge:

A misconduct complaint has been filed against a district judge. Complainant filed a pro se federal habeas petition, and the matter was assigned to the subject judge. The judge also presided over a state civil suit by complainant prior to joining the federal bench.

The bulk of complainant's allegations involve the judge's rulings as a state court judge in the earlier proceeding. Because the plain language of the Judicial Conduct and Disability Act limits its scope to conduct by federal judicial officers, 28 U.S.C. §§ 351(a) and (d)(1), these allegations must be dismissed. *See also* Judicial-Conduct Rules 4 and 11(c)(1)(G); *In re Complaint of Judicial Misconduct*, No. 06-89087 (9th Cir. Jud. Council 2007). Congress limited the scope of misconduct proceedings in order to preserve the constitutional scheme of presidential appointment and legislative confirmation:

The judicial branch has no constitutional role in considering the fitness of an individual to assume judi-

7713

cial office. Congress noted the differing roles of the coordinate branches in relation to judicial fitness, and recognized that "[b]ecause of the separation of powers principle established by the Constitution, these roles must remain separate."

*In re Charge of Judicial Misconduct*, No. 83-8037, at 25-26 (9th Cir. Jud. Council 1986) (Browning, C.J.) (quoting *H.R. Rep. No. 1313* at 5). It "would be incompatible with this constitutional principle" to sanction a judge for conduct preceding confirmation. *Id.* at 26.

Chief Judge Browning expounded on these principles in an opinion that was rendered long before orders in judicial misconduct cases were published on our web page. Indeed, at the time, the internet was little more than an obscure government research project. Because the opinion contains much useful analysis on this issue, it is appended and incorporated in part by reference.

To the extent complainant attempts to allege that the judge should have recused himself from the habeas petition, this allegation relates directly to the merits of the judge's rulings and must be dismissed. *See* 28 U.S.C. § 352(b)(1)(A)(ii); Judicial-Conduct Rules 3(h)(3)(A) and 11(c)(1)(B). A misconduct complaint is not a proper vehicle for challenging the merits of a judge's rulings. *See In re Charge of Judicial Misconduct*, 685 F.2d 1226, 1227 (9th Cir. Jud. Council 1982).

Complainant's allegations against other state court judges are also dismissed, as the Act only applies to federal judges. *See* Judicial Conduct Rule 4.

**DISMISSED.**

**APPENDIX**

UNITED STATES JUDICIAL COUNCIL

FOR THE NINTH CIRCUIT

IN RE CHARGE OF                    No. 83-8037

JUDICIAL MISCONDUCT          ORDER

Filed March 5, 1986

Before:   James R. Browning, Chief Judge

A complaint has been filed against a district judge in this circuit pursuant to the Procedures of the Ninth Circuit Relating to the Handling of Complaints of Judicial Misconduct Under 28 U.S.C. § 372(c), 28 U.S.C., 9th Cir. R. App. B (West Supp. 1985), issued under the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980. 28 U.S.C. §§ 332, 372, 604 (1982).

Complainant alleges acts of misconduct over a period of years. The allegations relate to conduct before the judge was appointed to the bench, and to both official and non-official conduct after his appointment. The difficult question posed by this complaint is whether the Act covers all of these allegations or only those relating to misconduct that adversely affects the functioning of the courts or the performance by the judge of his official duties. To resolve this question, I will first discuss the legislative history of the Act and then address the specific allegations of the complaint.

I.

The legislative history of the Act reflects a long and hotly debated effort by Congress to balance a perceived need for public accountability of members of the federal judiciary

against the need to preserve the independence of the judiciary and maintain the constitutional separation of powers. The debates focused on three primary elements of several legislative proposals: the forum that would consider complaints of judicial misconduct, the sanctions that would be available, and the types of conduct that would be covered. With regard to the conduct covered, congressmen, witnesses and commentators were divided into two camps.

One group believed public accountability and maintenance of public confidence in the judiciary were the primary goals, and the legislation therefore should create a system to deal with all allegations that a judge had engaged in conduct or was subject to a condition that would undermine public respect and trust in the judge and, because of his presence on the bench, in the judicial process itself. The model for this approach was found in state judicial disciplinary systems, which typically reached "willful misconduct in office, willful and persistent failure to perform duties of the office, habitual intemperance, or other conduct prejudicial to the administration of justice that brings the judicial office into disrepute." S. Rep. No. 1035, 95th Cong., 2d Sess. 32-33 (1978) (hereinafter *S. Rep. No. 1035*).

The other group, including the Judicial Conference of the United States, argued that the legislation should provide an administrative process for solving problems that involved interference with the effective conduct of the business of the courts, specifically problems created by the conduct or condition of a judge that impeded the fair and prompt disposition of litigation. The concern for the public's perception of the courts was tempered by a concern for preserving the independence of federal judges by limiting their exposure to personal harassment and abuse. The judicial councils of the circuits had exercised such administrative oversight for forty years under the authority of 28 U.S.C. § 332 (1964) (amended 1980), which required the councils to "make all necessary orders for the effective and expeditious administration of the

business of the courts." Proponents of this approach argued that no additional statutory authority was necessary to assure judicial accountability or, at most, that codification of existing procedures would suffice. The provisions ultimately included in the Act conformed more nearly to this administrative approach.

### A.   *Predecesssors to S. 1873*

In 1966 the Senate Subcommittee on Improvements in Judicial Machinery of the Committee on the Judiciary, under the chairmanship of Senator Tydings, began hearings on the problem of the "unfit judge." *See Judicial Tenure Act: Hearings on S. 1423 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary*, 95th Cong., 1st Sess. 61-62 (1977) (statement of Sen. Tydings) (hereinafter *1977 Senate Subcomm. Hearings*). After two years of study, Senator Tydings introduced the first judicial conduct and disability legislation of recent years, S. 3055, 90th Cong., 2d Sess. (1968), subsequently amended and reintroduced as S. 1506, 91st Cong., 1st Sess. (1969).

S. 1506 proposed creation of a Commission on Judicial Disabilities and Tenure with authority to investigate "the official conduct of any judge of the United States . . . to determine whether the conduct of such judge is and has been consistent with the good behavior required by [article III of the Constitution]." *Id.*, *reprinted in 1977 Senate Subcomm. Hearings* 64, 65. Senator Tyding's bill, which was heavily influenced by state models, particularly California's Commission on Judicial Qualifications, provided for removal of misbehaving or disabled federal judges. *1977 Senate Subcomm. Hearings* at 62 (statement of Sen. Tydings). The legislation did not receive substantial support, primarily because of opposition from those who believed impeachment to be the only means by which federal judges could be removed from office under the Constitution. *Id.* at 63, 76-77.

The next major attempt to create a statutory system of judicial discipline occurred in 1975 when Senator Nunn introduced S. 1110, 94th Cong., 1st Sess. (1975), the Judicial Tenure Act. That Act, like its predecessor, proposed an independent review council to investigate and remove federal judges for conduct "inconsistent with the good behavior required by article III section 1 of the Constitution." S. 1110 §§ 2(a), 3(a)(1), *reprinted in Judicial Tenure Act: Hearings on S. 1110 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary*, 94th Cong., 2d Sess. 4-5, 16 (1976) (hereinafter *1976 Senate Subcomm. Hearings*). Again the hearings focused on the constitutionality of this type of disciplinary scheme, with little elaboration on the specific conduct that would violate the "good behavior" standard. One witness before the Subcommittee urged that the "good behavior" standard be defined in the statute as including criminal misconduct in office, embezzlement, bribery, corruption, abuse of office, neglect of duty, habitual intemperance, *1976 Senate Subcomm. Hearings* at 94-96, 112-13 (testimony of Prof. Raoul Berger). Other witnesses suggested that the standard include conduct prejudicial to the administration of justice which brings the judicial office into disrepute. *Id.* at 48 (statement of John A. Sutro, Chairman, Standing Committee on Judicial Selection, Tenure and Compensation of the American Bar Association), 119 (statement of Jack E. Frankel quoting the standards of the California Commission on Judicial Qualifications).

Without further definition of the "good behavior" standard, the Subcommittee reported S. 1110 to the Judiciary Committee, but Congress adjourned without action by the full Committee.

In 1977 Senators Nunn and DeConcini introduced S. 1423, 95th Cong., 1st Sess. (1977), a second Judicial Tenure Act. S. 1423 was substantially the same as prior proposals; it provided for an independent commission to consider complaints for violation of the "good behavior" standard with removal as

a possible sanction. *1977 Senate Subcomm. Hearings* at 1 (statement of Sen. DeConcini). For the first time, the legislation defined conduct inconsistent with the "good behavior" standard as including "wilful misconduct in office, wilful and persistent failure to perform duties of the office, habitual intemperance, or other conduct prejudicial to the administration of justice that brings the judicial office into disrepute," S. 1423 § 2(a), *reprinted in id.* at 14-15 — the standard common in state statutes. Although some witnesses argued that the constitutional phrase "good behavior" should be left undefined, *see 1977 Senate Subcomm. Hearings* at 113-14 (statement of J. Michael McWilliams on behalf of the Standing Committee on Judicial Selection, Tenure and Compensation of the American Bar Association), the argument was rejected. *S. Rep. No. 1035* at 33. By adopting the standard used in many state judicial disciplinary systems, the Committee believed a body of case law would be available to aid the judicial discipline tribunal in applying the statute to specific cases. *Id.* at 33-36. The Senate Committee Report on S. 1423 also quotes the statement from the California Supreme Court's opinion in *Geiler v. Commission on Judicial Qualifications*, 10 Cal. 3d 270, 515 P.2d 1 (1973), that the disrepute standard covers "unjudicial conduct committed in bad faith by a judge not then acting in a judicial capacity." *S. Rep. No. 1035*, at 34. S. 1423 was approved by the Senate in the 95th Congress, but received no attention in the House.

### B.  *S. 1873*

The Judicial Conference had approved the Nunn-DeConcini bill "in principle" before it passed the Senate. After passage, however, the Conference restated its position to make it clear that the Conference disapproved any legislative proposal that included power to remove a federal judge by means other than impeachment. *Report of the Proceedings of the Judicial Conference of the United States* 49-50 (Sept. 1978). In view of the Conference's opposition, it appeared unlikely the House of Representatives would approve any

proposal permitting removal. The Senate Subcommittee on Improvements in Judicial Machinery then began work on S. 1873, 96th Cong., 1st Sess. (1979), a proposed compromise judicial tenure and discipline bill. S. 1873 did not allow for removal of misbehaving or disabled judges, nor did it create an independent review commission outside the judiciary. The bill placed primary responsibility for resolution of allegations against federal judges in the judicial council of each circuit, but created a centralized Court on Judicial Conduct and Disability to review council action. S. Rep. No. 362, 96th Cong., 1st Sess. 2-3 (1979) (hereinafter *S. Rep. No. 362)*.

The early draft of S. 1873 also replaced the "good behavior" standard of prior proposals with the requirement that a complainant allege conduct "inconsistent with the effective and expeditious administration of the business of the courts" *or* "prejudicial to the administration of justice by bringing the judicial office into disrepute." The first element of this new dual standard was taken from the provision of the Administrative Office Act of 1939 which created the judicial councils of the circuits and gave them authority to "make all necessary and appropriate orders for the effective and expeditious administration of the courts within the circuit." 28 U.S.C. § 332 (1964) (amended 1980); *see generally Administration of United States Courts: Hearings on H.R. 2973 and H.R. 8999 Before the House Comm. on the Judiciary*, 76th Cong., 1st Sess. (1939); *Administration of United States Courts: Hearings on S. 188 Before a Subcomm. of the Senate Comm. on the Judiciary*, 76th Cong., 1st Sess. (1939). The second element of the dual standard utilized language from state models such as that of California, and focused on the public perception of the judiciary rather than on the effective functioning of the judicial system.

The Judicial Conference opposed both the creation of a centralized Court on Judicial Conduct and Disability and the adoption of a dual standard for determining the conduct covered. The Conference pointed out to Congress that the circuit

council, acting solely under the administrative authority conferred upon them by section 332, and without outside intervention, had established administrative procedures for handling complaints of judicial misconduct, and had for many years dealt quietly, informally, and effectively with "problem judges" — disabled judges, alcoholic judges, senile judges, procrastinators. The Judicial Conference recommended to Congress that if any legislation were enacted, it be modeled on this existing procedure. *Judicial Tenure and Discipline — 1979-80: Hearings Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Comm. on the Judiciary*, 96th Cong., 1st and 2d Sess. 56-58 (testimony of Judge Hunter); 62-63 (March 1979 Resolution of the Judicial Conference of the United States) (hereinafter *1979-80 House Subcomm. Hearings*).

During the full committee markup the "disrepute" element of the dual standard was deleted from the bill. As Senator Thurmond later stated on the Senate floor, "[t]his so-called disrepute standard was dropped because it was felt that this standard could be too intrusive on the judge's personal life and was subject to possible abuse." 125 Cong. Rec. 30,050 (1979) (statement of Sen. Thurmond).

The Judiciary Committee's Report to the Senate contains ambiguous and contradictory statements regarding the conduct covered. The Report first states that the council may dismiss any complaint that is "without jurisdiction" or is "insufficient under the standards prescribed by the legislation," that is, which does not allege "conduct inconsistent with the effective and expeditious administration of the business of the courts," *S. Rep. No. 362* at 2, and that "[c]omplaints relating to the conduct of a member of the judiciary which are not connected with the judicial office or which do not affect the administration of justice are without jurisdiction . . . ." *Id.* at 3. The report also states that the object of S. 1873 "is to remedy matters relating to a judge's condi-

tion or conduct which interferes with his performance and responsibility. *Id.* at 6.

Other statements in the Report, however, point in a different direction. After stating that the legislation was primarily intended to reach conduct which falls short of that required for impeachment, the Report notes "[t]here have been documented instances and allegations of judicial misconduct . . . that do not rise to the level of constitutional prescription found in Article II, section 4, but which do bring the Federal judiciary into disrepute. Such judicial misbehavior should be investigated and, when warranted, remedied." *Id.* at 5. The sectional analysis in the Senate Report also suggests a broad coverage for the Act similar to that of state systems, not limited to conduct interfering with the effective operation of the courts but extending to any conduct bringing the judicial office into disrepute:

> The standards spelled out in the statute are to be given their common usage and already existing statutory understanding . . . . "Effective and expeditious administration of the business of the courts" is language already found in section 332 of title 28 and is intended to include willful misconduct in office, willful and persistent failure to perform duties of the office, habitual intemperance, and other conduct prejudicial to the administration of justice that brings the judicial office into disrepute. Each of these terms are terms which have been in use in several states which have existing judicial disability and disciplinary systems. Further, it is the intention of the Committee that the judicial council may consider, but is not bound by, other factors in determining whether the behavior of the judge is consistent with that specified in the bill. They include the following: (1) the Cannons [sic] of Judicial Ethics of the American Bar Association and the Code of Judicial Conduct for the United States Judges, as approved by the Judicial

Conference of the United States, (2) Resolutions of the Judicial Conference of the United States relating to judicial conduct, and (3) Acts of Congress relating to judicial conduct.

The Committee believes that the use of these grounds as specified in state law tends to make them "terms of art". This offers a body of case law which will aid the judicial councils and the Court on Judicial Conduct and Disability in applying federal law to specific cases as they arise.

If it is true that the specified grounds for [sic] becoming "terms of art", the Committee does not believe that it should attempt in this report to add a legislative gloss to the terms. The testimony given at the committee hearings on this bill and its predecessor will aid in interpretation.

*Id.* at 8-9.

Much of this discussion in the Senate Report on S. 1873 was taken verbatim from the Senate Committee Report on S. 1423, the predecessor to S. 1873. *See S. Rep. No. 1035* at 32-36. As we have seen, however, the earlier statute, S. 1423, adopted the "good behavior" standard and defined it, following state models, as including "conduct prejudicial to the administration of justice *that brings the judicial office into disrepute*." *Id.* at 32 (emphasis added). S. 1873, on the other hand, replaced the "good behavior" language with the phrase "conduct inconsistent with the effective and expeditious administration of the business of the courts," and deleted the reference to conduct "that brings the judicial office into disrepute." Ignoring these changes, the Report on S. 1873 simply copied the language used in the earlier report. *S. Rep. No. 362* at 8-9.

The Senate Report on S. 1873 suggests that in determining whether particular conduct is covered, the chief judges and

judicial councils of the circuits should give the statutory standards "their common usage and already existing statutory understanding." *Id.* Unfortunately, it appears from the procedures formulated by the circuits for handling complaints of judicial misconduct under section 332 prior to the enactment of the statute, that there was no consensus among them as to the meaning of the phrase in section 332 in relation to misconduct by judges.

The focus of the debate in the Senate was the constitutionality of any legislation permitting discipline of federal judges by means other than impeachment. *See* 125 Cong. Rec. 30,044-64 (1979) (statements of Sen DeConcini, Sen. Thurmond, Sen. Laxalt, Sen. Mathias, Sen. Heflin, Sen. Nunn, & Sen. Bayh). Little was said about the kind of conduct that was to be subject to the procedures established by the Act. Two senators commented on the subject. As noted earlier, Senator Thurmond called attention to the deletion by the Judiciary Committee of the "disrepute" standard and the reasons for that deletion:

> I feel it is also appropriate to comment on the standards which were not included in the final draft of S. 1873. During the full committee markup of this bill, the members of the committee agreed, at the suggestion of the senior Senator from Indiana, to delete a third standard which allowed the filing of a complaint if the judge had engaged in conduct prejudicial to the administration of justice by bringing the judicial office into disrepute. This so-called disrepute standard was dropped because it was felt that this standard could be too intrusive on the judge's personal life and was subject to possible abuse. The deletion of the disrepute standard was also requested by the Administrative Office of the U.S. Courts.

125 Cong. Rec. 30,050 (1979) (statement of Sen. Thurmond).

Senator Bayh commented on his understanding of the standard:

> The bill before us today is designed to handle misconduct by a judge which interferes "with the effective and expeditious administration of the business of his court," in other words his behavior as it affects his job as a judge: For example, whether he is behind in handling cases, or having a drinking problem, or suspected of having a conflict of interest in the cases before him.

*Id.* at 30,062 (statement of Sen. Bayh).

> S. 1873 also allows judges to be independent to live their personal lives as they see fit. Extrajudicial habits and behavior are outside the reach of the bill. It is only when a judge's behavior affects his performance on the bench that a complaint is valid. This again is as it should be.

*Id.* at 30, 064.

## C.  *House Consideration*

Shortly before S. 1873 was reported out of the Judiciary Committee of the Senate, the House began the consideration of legislation on judicial disability and tenure. Hearings on proposed legislation were held by the House Subcommittee on Courts, Civil Liberties, and the Administration of Justice beginning in July 1979. As in the Senate, most of the discussion was directed at the constitutionality of judicial discipline legislation and the need to establish a system that would minimize the threat to judicial independence. Such comment as appears concerning the conduct to be covered reflected an understanding that the standard, as written, was limited in coverage to conduct interfering with the fair and efficient operation of the courts.

Senator DeConcini, a strong proponent of judicial discipline legislation and a sponsor of S. 1873, testified that the procedures were intended to address complaints against judges "who through their arrogance continue to operate when conflicts of interest have been brought to their attention, to take such actions that indicate their disregard for recognized criminal procedure, [or] rules of procedure adopted by the court itself." *1979-80 House Subcomm. Hearings* at 27 (statement of Sen. DeConcini). Although many congressmen voiced their opinions regarding the legislation during the hearings, none of these comments bear on the issue of what conduct fell within the standards.

Many non-congressional witnesses, however, made clear their understanding that the standards, as written, were limited in scope to conduct interfering with the fair and efficient operation of the courts.

Judge Elmo Hunter, appearing on behalf of the Judicial Conference of the United States, noted that "judges have no right to be insulated from the consequences of their own misbehavior when it impairs the proper operation of the courts and the administration of justice." *Id.* at 55 (statement of Judge Hunter). He remarked that "the kind of 'judicial misbehavior' which is relevant is misbehavior which interferes with the effective and expeditious administration of the business of the courts." *Id.* at 60, 67.

The Department of Justice objected to use of such an administrative standard of misconduct, arguing that a broader standard was needed to reach conduct which, though unrelated to the administration of the courts, "would tarnish in the popular perception the image of the Federal courts." *Id.* at 170 (testimony of Maurice Rosenberg, Assistant Attorney General). The Department urged a return to a standard initially proposed and ultimately rejected in the Senate, defining misconduct "as action 'inconsistent with the good behavior required by article III, section 1, of the Constitution,' includ-

ing, but not limited to, 'willful misconduct in office, willful and persistent failure to perform duties of the office, habitual intemperance, or other conduct prejudicial to the administration of justice that brings the judicial office into disrepute.' " *Id.* at 163 (footnote omitted). According to the Department spokesman, the administrative standard would not reach misbehavior the Department believed required action, but which "wouldn't have to do with the business of the courts, or the expeditious movement of that business," *id.* at 170, citing as examples that a "judge might get into shady business deals or inappropriate financial entanglements . . . . A judge might get into a drunken brawl at a social party, private or public . . . [or a] judge might gamble heavily, notoriously, and with very bad company." *Id.* at 169-70.

The American Bar Association's Standing Committee on Judicial Selection, Tenure and Compensation shared the views of the Department of Justice. The ABA Committee commented:

> The language proposed by the judges: "conduct inconsistent with the effective and expeditious administration of the courts" is taken from 28 U.S.C. § 332. That section deals with administration and is inappropriate as a specification of the grounds for judicial discipline.

*Id.* at 213. (exhibit B to letter from Herbert H. Anderson, member, American Bar Association Standing Committee on Judicial Selection, Tenure and Compensation). The Committee's suggested list of conduct to be covered included "willful misconduct which although not related to judicial duties, brings the judicial office into disrepute," and "[c]onduct prejudicial to the administration of justice or conduct unbecoming a judicial officer, whether conduct in office or outside of judicial duties, that brings the judicial office into disrepute." *Id.*

H.R. 7974, 96th Cong., 2d Sess. (1980), the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980,

emerged from these hearings. The House proposal adopted the administrative standard drawn from section 332, as had the Senate's, but departed from the Senate proposal by requiring that included conduct be "prejudicial to" rather than merely "inconsistent with" the effective and expeditious administration of the business of the courts, thus indicating that a causal connection was required between the alleged misconduct and the administration of the courts. *Compare* S. 1873, 96th Cong., 1st Sess. § 2 (1979), *reprinted in* 125 Con. Rec. 30,100 (1980) *with* 28 U.S.C. § 372(c)(1). The House bill provided that actions taken by the circuit councils were to be reviewed by the Judicial Conference rather than by a Court of Judicial Conduct and Disability as provided in the bill enacted by the Senate. Thus, the House bill incorporated both of the major revisions in the Senate bill proposed by the Judicial Conference.

In doing so, the House Committee impliedly rejected the criticisms of the administrative standard based on section 332. There is no express comment on these criticisms, however, in the Committee report accompanying the bill. The report simply states that a complainant need only allege that a judge "has engaged in conduct that is inconsistent with the effective and expeditious administration of the business of the courts," H.R. Rep. No. 1313, 96th Cong., 2d Sess. 10 (1980) (hereinafter *H.R. Rep. No. 1313*), and that the chief judge "may dismiss the complaint if it does not relate to the effective, expeditious and fair administration of justice within the circuit." *Id.* The Report notes the concern that an "adversary accusatorial proceeding raised the dangers of a substantial chilling effect on judicial independence, as well as the danger of infliction of harm and disruption on the administration of justice," *id.* at 18 (footnote omitted), and states that the bill reported by the Committee would create "an administrative remedy, as opposed to the purely adjudicative and adversarial model that has prevailed in the past for such legislation." *Id.* at 4; *see also id.* at 14.

The House Report is not entirely without ambiguity with respect to coverage, however. It notes that one of the goals of the legislation is "to promote respect for the principle that the appearance of justice is an integral element of this country's justice system," *id.* at 1, refers to the Act covering complaints of "unfitness," *id.* at 5, and suggests that the Act would apply to "an allegation that several judges have engaged in activities demeaning to the bench; assume, for example, that . . . a large number of judges became intoxicated in a bar of ill repute." *Id.* at 12. Finally, the Report refers to the administrative standard and then states, "[c]learly, this incorporates complaints regarding impeachable behavior, [and] violations of the criminal laws of any State or the United States." *Id.* at 10.

H.R. 7974 was unanimously reported to the House of Representatives by the Judiciary Committee. There was no reference to the conduct intended to be covered by the bill in the debates preceding the vote, except an occasional quotation of the statutory standard. Congressman Kastenmeier moved to substitute the provisions of the House bill for the provisions of the Senate bill, S. 1873. The House agreed to the motion and unanimously passed the legislation by voice vote on September 15, 1980. 126 Cong. Rec. 25,372-74 (1980). The Senate passed the amended version of S. 1873 two weeks later with minor changes subsequently ratified by the House.

## II.

The legislative history of the Act, particularly in the Senate, contains ambiguous and inconsistent evidence of legislative intent. A clearer picture emerges, however, from a review of the chronological development of the legislation.

Earlier proposals in the Senate were broad, covering a wide range of conduct, establishing an independent adjudicatory court and authorizing sanctions as severe as removal from office. These proposals received no attention from the House. Each successive proposal in the Senate eliminated one or

another aspect of the scheme thought to pose a threat to judicial independence. By the time the final Senate bill, S. 1873, was reported to the full Senate, removal had been eliminated as a potential sanction, the primary authority for considering complaints against judges had been placed in the judicial councils of the circuits, an administrative approach had replaced the adversarial-adjudicatory approach, and the "good behavior" and "disrepute" standard had been replaced by a standard focusing on the effective and expeditious administration of the business of the courts.

The Senate Report states that coverage under S. 1873 was limited to conduct connected with the judge's official performance. It is true that some portions of the Senate Report still suggested that the "good behavior" and "disrepute" standards were somehow incorporated in the administrative test finally adopted as the jurisdictional standard. But as noted, most of this language was taken verbatim from a committee report on a predecessor bill which expressly adopted the state standards. These earlier proposals modeled on state systems received substantial support in the Senate, but were never considered by the House. Only after the Senate proposal had been pared down to a purely administrative format unlike the state systems did the House begin to work toward passage of the legislation.

Retention in the Senate Report of references to state standards was in all probability inadvertent. The Senate Committee eliminated the state-originated disrepute standard from the language of the Senate bill because of the concern for preserving judicial independence and the full Senate was so advised by the ranking minority member of the Committee, *see* 125 Cong. Rec. 30,050 (1979) (statement of Sen. Thurmond). As quoted above, Senator Bayh also stated on the floor that the Act was aimed at conduct adversely affecting official performance rather than the public perception of a judge's private conduct. *See Id.* at 30,062, 30,064 (statement of Sen. Bayh). If other members of the Senate believed the Act would reach

conduct which was unrelated to the judicial office, but brought that office into disrepute, a response to these clear and unequivocal statements to the contrary might have been expected. There was none.

Even if some members of the Senate intended S. 1873 to reach conduct unrelated to the judicial office, it was not the Senate but the House that succeeded in drafting the compromise bill eventually enacted. The history of the legislation in the House is far less ambiguous and contradictory than in the Senate. Although witnesses before the House Subcommittee had differing views as to the conduct that should be covered, all appeared to agree that the language adopted — "conduct prejudicial to the effective and expeditious administration of the business of the courts" — would cover only conduct directly affecting the functioning of the courts or the performance of judicial duties.

As noted, two statements in the House Report may suggest a broader coverage. First, the Report's statement that the standard incorporates violations of state and federal criminal law is not necessarily inconsistent with an administrative standard. Conduct by a judge that violates the criminal law may not in itself affect the administration of the court or the judge's official performance, but conviction of such conduct with the possibility of incarceration obviously would, and the reference may easily be read as applying to conviction of crime rather than to mere allegation of unproved criminal conduct. To subject a judge to administrative proceedings on the basis of unproved allegations of criminal conduct that do not themselves reveal a deficiency in the judge's performance would be inconsistent with congressional intent to protect judicial independence.

The second reference, concerning the intoxication "of a large number of judges at a bar of ill repute" is misleading out of context. In context the discussion concerned the kind of cases that a judicial council of a circuit should certify directly

to the Judicial Conference rather than deciding itself. *See* 28 U.S.C. § 372(c)(7)(B)(ii). The focus was on the number of judges involved and their relationship and the consequent need to avoid the appearance of conflicting loyalties by those charged with considering the complaint. The reference was merely a misleading attempt to explain the purpose of section 372(c)(7)(B)(ii) permitting referral to the Judicial Conference; it cannot be reasonably read as intended to expand the jurisdictional limits established by the administrative standard adopted in the Act.

The conduct covered by the Act was not mentioned on the House floor; congressmen speaking in support of the bill merely quoted the administrative standard without elaboration. No one expressed concern that the administrative standard was too narrow to achieve the Act's purpose. Nothing in the House debates supports an interpretation that would include conduct not within the literal language of the Act: "conduct prejudicial to the effective and expeditious administration of the business of the courts."

The most reasonable conclusion to be drawn from the House materials is that the House intended to limit jurisdiction under the Act to conduct adversely affecting judicial performance in some concrete manner. Although some evidence of legislative intent in the Senate is ambiguous and might be selectively used to support a broad jurisdictional standard, as in state systems, the continuous, progressive narrowing of the scope of the Senate proposals, and the action finally taken by the Senate and the reasons given for that action, lead to the same conclusion. Taken as a whole the legislative history of both chambers can be harmonized only by interpreting the phrase "prejudicial to the effective and expeditious administration of the business of the courts" according to its plain meaning and requiring complaints to allege conduct affecting the functioning of the courts.

With this understanding of the jurisdictional standard and its application, I address the specific allegations of the complaint.

## III.

### A.

Most of the complainant's allegations involve conduct by the judge while engaged in private practice as an attorney prior to his appointment, unrelated to the effective functioning of the judge's court. The plain language of the statute indicates its scope is limited to conduct by a judicial officer. "Any person alleging that a circuit, district or bankruptcy judge, or a magistrate" has engaged in conduct covered by the Act may file a complaint. The legislative history contains only one reference to conduct preceding the judge's appointment to the bench. That reference suggests that such conduct is not covered by the Act. *See 1979-80 House Subcomm. Hearings* at 105 (testimony of Judge Wallace).

The principle of separation of powers supports this construction. Article III, Section 2 of the United States Constitution vests the President with power to nominate officers of the United States, including federal judges, and to appoint such officers with the advice and consent of the Senate. The judicial branch has no constitutional role in considering the fitness of an individual to assume judicial office. Congress noted the differing roles of the coordinate branches in relation to judicial fitness, and recognized that, "[b]ecause of the separation of powers principle established by the Constitution, these roles must remain separate." *H.R. Rep. No. 1313* at 5. It would be incompatible with this constitutional principle for the judiciary to review the determination of the executive and legislative branches in the nomination and confirmation process by investigating and possibly disciplining a judge for conduct occurring before appointment to the bench.

Confirmation by the Senate does not, of course, shield a judge from responsibility for prior misconduct. If allegations of pre-confirmation conduct involve violation of the state's ethical standards for lawyers, the complainant may file charges with the state bar association's disciplinary body. If the allegations rise to the level of criminal conduct, as in this case, complainant may lodge his complaint with the United States Department of Justice or the appropriate state law enforcement authorities. If the allegations involve conduct constituting "Treason, Bribery or other high Crimes and Misdemeanors," complainant may take the complaint directly to the House of Representatives. Complainant has, in fact, submitted his complaint and supplemental materials directly to Congress as well as to state and federal prosecutors.

Complainant acknowledges that we may lack jurisdiction over most of his allegations and urges us, also, to refer the complaint to the House of Representatives. The Act does provide that if the judicial council of the circuit determines that a judge has engaged in conduct "which might constitute one or more grounds for impeachment . . . the judicial council shall promptly certify such determination . . . to the Judicial Conference of the United States." 28 U.S.C. § 372(c)(7)(B)(i). This is not, however an independent grant of power. Before the council may conduct the investigation and make the factual determination necessary to certify that a judge has engaged in conduct that might constitute a ground for impeachment, the council must first be presented with allegations of conduct over which it has jurisdiction under section 372(c)(1).

. . .

The . . . allegations of the complaint are dismissed on the ground they are not within the jurisdiction of the Judicial Council of the Ninth Circuit under section 372(c)(1).

James R. Browning
Chief Judge

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON REUTERS/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2009 Thomson Reuters/West.